Edward S. BENEVILLE, Jr., individually and derivatively on behalf of Carnet Holding Corporation, a Delaware corporation, Plaintiff,

v.

Michael YORK and Eli Dabich, Jr., Defendants.

and

Carnet Holding Corporation, a Delaware corporation, Nominal Defendant.

Civil Action No. 17638.

Court of Chancery of Delaware, New Castle County.

Submitted: June 20, 2000.
Decided: July 10, 2000.

Francis G.X. Pileggi, Robert M. Unterberger, of Manta and Welge, Wilmington, Delaware, for Plaintiffs.

James C. Strum, of Stradley Ronon Stevens & Young, of Wilmington, Delaware, for Defendant Michael York.

Kurt M. Heyman, Patricia L. Enerio, of the Bayard Firm, Wilmington, Delaware, for Defendant Eli Dabich, Jr.

Anne C. Foster, Thad J. Bracegirdle, Michael J. Merchant, of Richards, Layton & Finger, Wilmington, Delaware, for Nominal Defendant.

## OPINION

STRINE, Vice Chancellor.

Plaintiff Edward S. Beneville, Jr. has filed this derivative action, in which he alleges that two of the then-directors of CARNET Holding Corporation, defendants Michael York and Eli Dabich, Jr., breached their fiduciary duties as directors of CARNET. York and Dabich, the complaint asserts, caused CARNET to enter into a technology licensing and marketing agreement (the "Marketing Agreement") with a subsidiary of another corporation,

SYNERGY 2000, Inc. ("SYNERGY"), that they controlled as officers and through their ownership of 57% of that company's shares. York and Dabich are alleged to have concealed the Marketing Agreement from the rest of the CARNET board and to have consummated it on terms that are unfair to CARNET and correspondingly overgenerous to SYNERGY.

Although Dabich left the CARNET board before this suit was filed, York is still CARNET's Chairman of the Board and Chief Executive Officer. At the time this lawsuit was filed, York was one of two members of the CARNET board. The other member is a concededly disinterested and independent director.

■ In this opinion, I address a single, determinative legal question raised by a motion to dismiss filed by York, Dabich, and nominal defendant CARNET:

> When one member of a two-member board of directors cannot impartially consider a stockholder litigation demand, is the stockholder excused from making a demand for purposes of Court of Chancery Court Rule 23.1?

After considering this question, I conclude that demand is excused in these circumstances. It is, of course, true that Delaware case law has said that a stockholder must show that a "majority" of the directors could not impartially consider a demand, because they either were interested in the transaction or could not act independently of those who were. A deeper reading of the cases reveals, however, that the central question is whether there is a sufficient number of impartial directors who can cause the corporation to act favorably on a demand by bringing suit. If the members of the board who cannot impartially consider the demand have the corporate power to prevent the corporation from bringing suit, then our law considers demand futile, whether it is because the conflicted directors command a majority or because they have equal voting power with the impartial directors. Under traditional rules of board governance, an equally divided vote on a motion to bring suit has the same effect as a vote in which the motion is defeated by a one vote majority. In either case, the motion is unsuccessful and does not become corporate policy.

Given this reality, it would be logically incoherent for Delaware courts to refuse to excuse demand where half of the board cannot impartially consider a demand but to excuse demand where a bare majority cannot act impartially. As a result, I deny the defendants' motion to dismiss.

### I. The Allegations That York and Dabich Breached Their Fiduciary Duties

The relevant allegations of the complaint can be stated briefly.[1] According to the complaint, plaintiff Beneville and defendant York founded CARNET in 1987 to act as an underwriter of car insurance in urban areas in California. Apparently York served as CARNET's CEO and Beneville as its President, and both served as directors.

In 1996, CARNET began developing an automated automobile insurance policy management software system to replace the inadequate one it had been leasing from an outside vendor. CARNET called its new system "ARGOS." CARNET hoped not only to use ARGOS to assist with CARNET's own business but more significantly for this case, to market AR-

---

1. In resolving this motion, I apply the familiar procedural standard applicable under Court of Chancery Rule 23.1. *See, e.g., Gro-* *bow v. Perot,* Del.Supr., 539 A.2d 180, 187–88 (1988).

GOS to other insurance agencies for their use. To that end, CARNET developed business plans involving the outside marketing of ARGOS.

Despite this corporate strategy, from mid–1997 to mid–1998, York allegedly conspired with defendant Dabich, also at that time a CARNET director, to divert much of the benefit of the ARGOS system to another publicly-traded company, SYNERGY, in which they respectively held 21% and 36% of the shares, or a collective 57% interest. To that end, in late June 1998, York and Dabich caused CARNET to enter into the Marketing Agreement with a wholly-owned SYNERGY subsidiary. York executed the deal for CARNET and Dabich for SYNERGY.

The Marketing Agreement gave SYNERGY a license to market and sell the ARGOS software through its subsidiary. In exchange, CARNET received 39% of the stock of the subsidiary and a 10% royalty on any ARGOS sales.

According to the complaint, York and Dabich concealed their consideration of the Marketing Agreement from the other members of the CARNET board until that Agreement had already been executed. Indeed, the complaint asserts that York and Dabich continued to be deceptive even at the board meeting at which they revealed the Marketing Agreement. Instead of admitting that the Marketing Agreement was already executed, York and Dabich led the other directors to believe that it was still a mere proposal.

The complaint alleges that the Marketing Agreement provided no real value to CARNET. Rather than being able to market and develop ARGOS itself and receive 100% of the benefit, CARNET re-

ceived stock of dubious value in a non-public SYNERGY subsidiary and a royalty stream in exchange for marketing rights SYNERGY itself valued at nearly one million dollars. As important, the complaint implies, York and Dabich spent so much time figuring out how to transfer control over the marketing of ARGOS to SYNERGY that they damaged the ability of CARNET to perfect the software, thereby endangering the product's viability.

To date, the complaint asserts, SYNERGY has been unsuccessful in marketing ARGOS to CARNET's detriment. Not only that, but SYNERGY has failed to live up to the Marketing Agreement by providing CARNET with the additional stock it was promised in the event that SYNERGY did not meet certain sales targets.

In sum, the complaint alleges that York and Dabich undertook self-interested action to assume undue control over and obtain excessive personal benefits from an important CARNET product and that they did so in an intentionally covert way.[2]

## II. *The CARNET Board Of Directors At The Time This Suit Was Filed*

Before this suit was filed, plaintiff Beneville and defendant Dabich left the CARNET board of directors. As of the time this case was initiated, the CARNET board of directors consisted of two members: defendant York and Douglass Hallett. Beneville does not contest either the disinterestedness or independence of Hallett for purposes of this motion. But Beneville does, quite logically, claim that York was interested in the Marketing Agreement and that York cannot impartially consider a demand that CARNET sue to rescind and recover damages arising from that transaction.

2. In an oral ruling, I determined that the complaint stated a claim against both York and Dabich for breach of their fiduciary duty of loyalty and also denied the defendants' motion for summary judgment.

■ Although the defendants do not concede York's interest, their argument that he is disinterested is at odds with the plain language of 8 *Del. C.* § 144 and with settled case law. The Marketing Agreement was between CARNET, a company that York served as a CEO and director, and SYNERGY, a "corporation ... in which [York, was a] director[ ] ... [and] ha[d] a financial interest ..."[3] Thus York had a classic self-dealing interest in the Marketing Agreement. This suffices to render him interested and disabled from impartially considering a demand.[4]

### III. *Was Demand On The Carnet Board Of Directors Excused?*

■ The parties agree that if York is interested, this motion hinges on the question of whether demand is excused where half of a board of directors cannot impartially consider a demand. Because York and Dabich concealed the Marketing Agreement from the CARNET board until it was a *fait accompli* and because no decision of the CARNET board itself is challenged in the complaint, the parties agree that the demand excusal test must be applied to the two-man CARNET board

in place at the time the suit was filed.[5] Thus I must determine whether that board could properly exercise its "independent and disinterested business judgment" in responding to a demand by Beneville.[6]

If the CARNET board was comprised of York, Dabich and Hallett at the time this case was filed, it would be clear that demand was excused because a majority of the board would have been "interested" and thus disabled. By contrast, if the board was comprised of York, Hallett, and another concededly independent and disinterested director at the time this suit was filed, then demand would not have been excused, because a disinterested and independent board majority would have existed. But the question here is whether demand is excused when a board is evenly divided between directors who are considered capable of impartially considering a demand and those who are not.

For their part, the defendants cling to the life raft of a literal reading of Supreme Court case law, which has often stated that a stockholder must show that a "majority of the board of directors either has a financial interest in the challenged transaction or lacks independence...."[7] The defen-

---

3. 8 *Del. C.* § 144(a) (addressing the issue of a "contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest"). *See also Rales v. Blasband,* Del.Supr., 634 A.2d 927, 936 (1993) ("A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.").

4. *Harbor Finance Partners v. Huizenga,* Del. Ch., 751 A.2d 879, 886–87 (1999) (where a director is interested under § 144, he is interested for purposes of the demand excusal analysis under Court of Chancery Court Rule 23.1); *HMG/Courtland Properties, Inc. v. Gray,* Del. Ch., 749 A.2d 94, 112–14 (1999) (same

reasoning applied to business judgment rule). Even were the *Cede II/Cinerama* materiality analysis to apply to an interest that clearly implicates § 144, it is implausible to conclude that York's 21% interest in SYNERGY was immaterial to him. *See Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 362–64 (1993) (*"Cede II"*) (subsequent history omitted); *Cinerama, Inc. v. Technicolor, Inc.,* Del. Supr., 663 A.2d 1156, 1167–70 (1995) (subsequent history omitted).

5. *Rales,* 634 A.2d at 934.

6. *Id.*

7. *E.g., Levine v. Smith,* Del.Supr., 591 A.2d 194, 205 (1991); *see also Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814–15 & n. 8 (1984).

dants also rely on the great reluctance with which Delaware law takes decisions out of the hands of duly elected directors and therefore assert that a stockholder ought to be required to test the demand process in a situation where a board's composition is in equipoise between conflicted and unconflicted members.

For his part, Beneville contends that the case law stands for a proposition that is at odds with the hyperliteral reading that the defendants give it. He asserts that the underlying premise of our case law is that demand should be excused only where there exists a disinterested and independent board contingent that possesses the power to cause the corporation to act affirmatively on the demand. Where that is the case, a stockholder must submit a demand. But where such a contingent does not exist and the impartial board members must persuade an interested or non-independent director to join them in voting to bring suit, demand should be excused as futile because the board cannot exercise a truly unconflicted judgment.

After considering these arguments, I am persuaded that Beneville's reading of our law is the more logically and doctrinally consistent one. Several reasons support that conclusion.

First, the focus on "majority" in the seminal case of *Aronson v. Lewis* was on whether there was an independent and disinterested board "majority" that voted in favor of the transactions under challenge.[8] That is, the Supreme Court looked to whether the impartial board members had the power to consummate the challenged transaction without the votes of the other directors.[9]

The more recent case of *Rales v. Blasband* also emphasizes that it is the power of the impartial board members to determine corporate policy that is at the heart of Delaware's demand excusal standards. As *Rales* states:

> [I]t is appropriate in these situations to examine whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations. Thus, a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.[10]

8. 473 A.2d at 814.

9. Likewise, the Supreme Court's emphasis on the business judgment rule supports excusing demand in the case of an evenly divided board. In a situation, for example, where an evenly divided six-person board supported a transaction by the votes of three interested directors and one independent director with two independent directors dissenting, *Aronson* and other uncontroversial case law would deny business judgment rule protection to the board's decision. And in a situation where a plaintiff shows that the business judgment rule is inapplicable to a board decision, *Aronson* plainly states that "futility of demand has been established by any objective or subjec-

tive standard." *Id.* at 815. Although the two-person board context at issue in this case makes the pure business judgment rule analysis somewhat murkier because the sole impartial director would always constitute "a majority of the disinterested directors" under 8 *Del. C.* § 144(a)(1), the key fact remains that the interested director possesses the blocking power to stop the impartial director from acting as he wishes.

10. 634 A.2d at 934; *see also, id.*, 634 A.2d at 935 n. 12 (noting that by making a demand, a stockholder "concedes the independence and disinterestedness of a majority of the board to respond [to the demand]"); *Heineman v. Datapoint*, Del Supr., 611 A.2d 950, 952 (1992)

As a doctrinal matter, it thus makes little sense to find that demand is required in an evenly divided situation. The reality is that a majority vote is required to prevail on a board motion to cause the corporation to accept a demand;. an evenly divided vote does not suffice. In addressing a demand, therefore, the board cannot decide to bring suit unless an interested or non-independent director breaks rank. Put simply, the impartial directors do not have the power unilaterally to cause the corporation to act on the demand. Thus, per the Supreme Court's reasoning in *Levine v. Smith*, "it may be inferred that the Board is *incapable* of exercising its power and authority to pursue the derivative claims directly." [11]

Then–Vice Chancellor Chandler's well-reasoned decision in *Katell v. Morgan*

*Stanley Group, Inc.*,[12] supports this reading of the cases. In *Katell*, the defendants argued that demand on the general partners of a limited partnership was required because only one of the two general partners could not impartially consider a demand. Although the case was decided in the limited partnership context, Vice Chancellor Chandler looked to *Aronson* and *Levine* for guidance and concluded that "demand [was] excused under the first prong of the *Aronson* test" because the "supposedly independent partner [was] unable to act on claims made upon the general partners without the agreement of the interested one." [13] The reasoning of *Katell* is fully applicable to the corporate context and does not hinge in any material way on the fact that a limited partnership was the nominal defendant in that case.[14]

("[D]emand is futile where a reasonable doubt exists that the board has the ability to exercise its managerial power, in relation to the decision to prosecute, within the strictures of its fiduciary obligations.").

**11.** 591 A.2d at 205 (emphasis in original).

**12.** Del. Ch., C.A. No. 12343, mem. op., 1993 WL 10871, Chandler, V.C. (Jan. 14, 1993), *rearg. denied*, 1993 WL 106067 (Mar. 29, 1993).

**13.** *Id.*, 1993 WL 10871, at *6.

**14.** The pre-*Aronson* case of *Kaufman v. Beal* held that demand on a corporate board was excused where half the board was conflicted, as has a United States District Court applying Delaware law after *Aronson*. *See Kaufman v. Beal*, Del. Ch., C.A. Nos. 6485, 6526, 1983 WL 20295, at *8, Hartnett, V.C. (Feb. 25, 1983); *Bilunka v. Sanders*, 1994 WL 447156, at *2 (N.D.Cal. Mar. 1, 1994); *see also* R.F. BALOTTI & J.A. FINKELSTEIN, 1 THE DELAWARE LAW OF CORPS. & BUS. ORGANIZATIONS § 13.13, at 13–47 (2000) (relying on *Katell* for the proposition that "demand may be excused where the complaint alleges that half (as opposed to a majority) of the board labors under a disqualifying interest."); *but see* D.J. WOLFE, JR. & M.A. PITTENGER,

CORPORATE & COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 9–2(b)(3)(iii), at 561 n. 196 (1999) (summarizing the cases as holding that "where a disabling interest has been demonstrated with respect to directors constituting less than a majority of the board, demand has been held unnecessary" and relegating *Katell* to a *"compare"* cite).

*Katz v. Halperin* does not contain a holding to the contrary. Del. Ch., C.A. No. 13811, mem. op., 1996 WL 66006, Steele, V.C. (Feb. 5, 1996). In that case, Vice Chancellor Steele held that three members of a four-member board were disinterested and independent and that demand was therefore not excused. *Id.*, 1996 WL 66006, at *7–*9. Although there is language in the opinion that could be read as suggesting that demand is not excused if the board is evenly divided between impartial and non-impartial board members, *see id.*, 1996 WL 66006, at *7, that language is pure dictum. In fact, Vice Chancellor Steele was quite careful to note that "[w]hether one adopts Vice–Chancellor Chandler's approach that a majority of disinterested directors must remain intact after a plaintiff's attack, or whether that plaintiff must successfully defeat an actual arithmetic majority, the result is the same." *Id.*, 1996 WL 66006, at *9. Finally, Vice Chancellor Steele's opinion can be read

The reading given the cases by *Katell* is also the one that best promotes a doctrinally coherent approach to the demand excusal analysis. Although the defendants argue that a plaintiff like Beneville ought to have to give it the college try in an evenly divided situation on the ground that the conflicted board members might defer to the impartial board members, there is no reason why this potential is appreciably greater in an evenly divided context than in a bare majority context. Similarly, the defendants' suggestion that the disinterested CARNET board member, Hallett, could simply file a suit on behalf of the corporation [15] without the approval of York and force York to bring suit to enjoin the action applies with no greater force here than in a situation where the independent directors are in the minority. In both cases, the defendants are suggesting that derivative plaintiffs should make demand if there is a potential that a corporate anomaly should transpire: namely, that corporate policy would be set not by a board resolution, but by a board minority.

Our case law has not rested a plaintiff's right to bring a derivative suit on a willingness to first test whether a corporate board will act in such an unusual manner. Rather, it is enough for a plaintiff to show that there is an absence of impartial board members necessary to cause the corporation to accept demand.

To the extent that the defendants in a particular case wish to argue that less than a board majority can cause the corporation to accept demand,[16] the burden is on them to identify the basis for that assertion. No such showing has been made in this case, and I presume that Hallett cannot cause CARNET to accept demand without York's concurrence.

As such, demand is excused and the defendants' motion to dismiss is DENIED.[17] IT IS SO ORDERED.

as suggesting his agreement that where there is a two-man board consisting of only one impartial director and both members must vote together to constitute a "majority" to accept demand, then demand is excused. *Id.* 1996 WL 66006, at \*7–\*8 & n. 6 (noting that *Katell*'s reasoning is "unquestionably clear and correct" in a situation where "[t]here could only be a majority if *both* partners voted together") (emphasis in original).

15. The defendants' argument ignores the fact that independent directors usually lack the authority to obligate the corporation to make financial commitments. Absent board approval, how are they going to pay counsel? Nor should Delaware lightly take an approach to these questions that encourages rogue board minorities to seize the right to act for the corporation by *coup d'etat* when they believe that the majority is conflicted. Through the corporate electoral and removal process and the judicial system, such board minorities may protect the rights of stockholders in an effective and orderly manner.

16. Assume, for example, that a corporation, by certificate or bylaw, has a standing litigation committee comprised solely of non-management, independent directors who are empowered to accept demands without involvement by the other board members. Without deciding the question, I assume that Delaware courts would give careful consideration to a claim by the defendants that demand must be made in such circumstances. *Cf. Kahn v. Tremont*, Del.Ch., C.A. No. 12339, mem. op. 1992 WL 205637, Allen, C. (Aug. 21, 1992) & C.A. No. 12339, mem. op., 1994 WL 162613, at \*1 & n. 2, Allen, C. (Apr. 21, 1994, rev. Apr. 22, 1994) (appearing to be open to the possibility that demand might be required if approval of a transaction had been delegated to an effective special committee of impartial directors) (*citing Zapata Corp. v. Maldonado*, Del.Supr., 430 A.2d 779, 787 (1981)), *rev'd on other grounds*, Del.Supr., 694 A.2d 422 (1997).

17. Defendant Dabich advances one argument unique to himself. Because he is no longer

on the board, Dabich argues that the CAR-NET board is not conflicted in determining whether to sue him for breach of fiduciary duty. Without commenting in any way on whether a defendant-by-defendant approach to a demand might be warranted in particular circumstances, I reject such an approach in this case because the complaint alleges that York and Dabich acted together to take advantage of CARNET. It is therefore implausible that York could vote to sue Dabich without realizing that he would also have to vote to sue himself or face a lawsuit challenging his self-interestedly inconsistent approach to addressing the demand.