**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: December 2, 2016
Date Decided: March 29, 2017

John L. Reed, Esquire
Ethan H. Townsend, Esquire
DLA Piper LLP
1201 North Market Street, Suite 2100
Wilmington, DE 19801

Richard D. Heins, Esquire
Peter H. Kyle, Esquire
Ashby & Geddes
500 Delaware Avenue
Wilmington, DE 19801

Rudolf Koch, Esquire
J. Scott Pritchard, Esquire
Matthew D. Perri, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

John A. Sensing, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE 19801

Bradley R. Aronstam, Esquire
Nicholas D. Mozal, Esquire
100 S. West Street, Suite 400
Wilmington, DE 19801

Re: *LVI Group Investments, LLC v. NCM Group Holdings, LLC and Subhas Khara*, Civil Action No. 12067-VCG

Dear Counsel:

This rather complex litigation can usefully be conceived in simplified form as follows. Two large demolition firms—Delaware LLCs—merged their businesses into a single entity, NorthStar Group Holdings, itself a Delaware LLC of which the firms became the members (the "Merger"). The percentage ownership of the

member LLCs in NorthStar was based on a formula pegged to each LLC's financial statements prior to the Merger. These financial statements, in turn, were subject to certain representations and warranties from each LLC. The parties to the Merger agreed to indemnify one another for breaches of the merger agreement (the "Contribution Agreement"), including for inaccuracies in the representations and warranties, but such indemnification is capped at $15 million. The Contribution Agreement provides for unlimited recovery for fraud, however. Both parties, respectively via complaint and counterclaim, have alleged the other has committed fraud regarding its financial representations.

Before me are the Counterclaim Defendants' (collectively, the "Counter-Defendants") Motions to Dismiss. The allegations of fraud against the Counter-Defendants—including one of the member LLCs, LVI Group Investments ("LVI"), and individuals associated with that entity—are pled in minimal fashion. At the motion to dismiss phase, however, the pleadings need only make ultimate recovery reasonably conceivable. It is true, as the Counter-Defendants point out, that elements of fraud must be pled with particularity, in order that a defendant may reasonably understand and defend the allegations against it. Here, however, I find the required elements pled: the Counterclaim Plaintiff—the other member LLC, NCM Holdings ("NCM")—alleges that LVI and its agents made certain financial representations; that the representations were made to NCM in negotiating and

2

consummating the NorthStar merger, including with respect to NCM's percentage ownership; that these representations have proved false or inaccurate; that the Counter-Defendants knew the representations were false when made; and that NCM reasonably relied thereon to its detriment, while LVI profited from the false representations. This is sufficient particularity in a pleading of fraud to withstand dismissal. It is true, as the Counter-Defendants point out, that a required element— these parties' knowledge and intent regarding the falsity of the representations—is pled in a general averment. Knowledge, however, is not an element of fraud that must be pled with particularity. Accordingly, I find that the fraud allegations survive this motion to dismiss.

The Counter-Defendants also seek to dismiss claims, brought by NCM both directly and derivatively on behalf of NorthStar, against current and former officers of NorthStar, who, NCM alleges, acted in support of the fraudulent activities described above. Those allegations fail to state cognizable claims. My rationale follows.

## I. BACKGROUND[1]

### A. *The Parties*

Counterclaim Plaintiff NCM is a Delaware limited liability company and a member of NorthStar, of which NCM owns 37.5%.[2] Counterclaim Defendant LVI is a Delaware limited liability company and also a member of NorthStar, of which it owns 62.5%.[3] Prior to the Merger, NCM and LVI were competitors that were each engaged in the "business of demolition and remediation of large-scale projects."[4]

Nominal Defendant NorthStar is a Delaware limited liability company formed by the Merger.[5] NorthStar's Board of Directors (the "Board") is comprised of eleven individuals.[6] Counter-Defendant Scott State is an owner of LVI and was "one of the persons who caused LVI to merge with NCM."[7] Leading up to the Merger, State was a managing member of LVI and LVI's President and CEO.[8] State was also President and CEO and a member of the boards of several LVI subsidiaries.[9] Prior to the Merger, State "participated materially in the management of LVI" and, after

---

[1] The facts, drawn from NCM's Amended Verified Counterclaim Complaint (the "Counterclaim" or "CC") and from documents incorporated by reference therein, are presumed true for purposes of evaluating Counter-Defendants' Motion to Dismiss.

[2] CC. ¶ 5.

[3] *Id.* at ¶ 6.

[4] *Id.* at ¶ 12.

[5] *Id.* at ¶¶ 9, 19.

[6] *Id.* at ¶ 123.

[7] *Id.* at ¶ 7.

[8] *Id.*

[9] *Id.*

4

the Merger, State "continues to participate materially in the management of NorthStar."[10]

Counter-Defendant Paul Cutrone is an owner of LVI and "was one of the persons who caused LVI to merge with NCM."[11] Leading up to the Merger, Cutrone was the Vice-President and CFO of LVI and several of its subsidiaries, as well as a member of the subsidiaries' boards.[12] Cutrone "participated materially in the management of LVI before the Merger and NorthStar after the Merger."[13] LVI, Cutrone, and State collectively comprise the Counter-Defendants.

*B. The Merger*

LVI approached NCM in September 2013 about a strategic merger between the two companies.[14] Initially, NCM was not interested in the proposed merger due to recently restructuring its debt and equity.[15] LVI continued its pursuit, however, and NCM eventually relented and agreed to discuss a merger.[16] LVI and NCM executed a non-disclosure agreement and negotiated throughout the end of 2013 and into the beginning of 2014.[17] Eventually, LVI and NCM agreed on a 62.5/37.5 split,

---

[10] *Id.*
[11] *Id.* at ¶ 8.
[12] *Id.*
[13] *Id.*
[14] *Id.* at ¶ 13.
[15] *Id.*
[16] *Id.* at ¶¶ 14–15.
[17] *Id.* at ¶ 15.

5

"with LVI receiving 62.5% of the new company and NCM receiving 37.5% thereof."[18]

On or about April 23, 2014, LVI and NCM "contributed and merged their subsidiaries" into a newly formed entity, NorthStar, pursuant to their merger agreement, the Contribution Agreement.[19] "State and Cutrone became CEO and CFO of NorthStar, respectively," although NorthStar now no longer employs Cutrone.[20] "Pursuant to the Contribution Agreement, LVI submitted consolidated financial statements of the subsidiaries it was contributing to NCM" (the "LVI Financial Statements").[21] LVI represented and warranted in the Contribution Agreement that the LVI Financial Statements

> fairly present, in all material respects, the consolidated financial position of the LVI Subsidiaries as of their respective dates, and the consolidated results of operations and cash flows of the LVI Subsidiaries for the respective periods covered thereby, in conformity with GAAP consistently applied throughout the period covered thereby . . . .[22]

LVI also agreed to indemnify "and hold harmless [NorthStar] and each of its Subsidiaries from and against all Losses arising out of, relating to or resulting" from any inaccuracy in LVI's representations and warranties with respect to the LVI

---

[18] *Id.*

[19] *Id.* at ¶ 19.

[20] *Id.* at ¶ 20; Countercl. Pl's Answering Br. 42 n.4.

[21] CC. ¶ 21.

[22] *Id.* at ¶ 22; *Id.* at Ex. A (the "Contribution Agreement") § 3.4(b).

Financial Statements.[23] The Contribution Agreement also included a notice and claim procedure "pursuant to which NCM could bring a claim to enforce LVI's indemnity obligation to NorthStar" and provided that "the parties' exclusive remedies in connection with the Merger were" indemnification claims, which the Contribution Agreement capped at $15 million, and fraud claims, which were not capped.[24]

### C. Post-Merger Facts Leading to this Litigation

Soon after the Merger, NorthStar began recognizing losses on the LVI legacy jobs.[25] NCM served a claim notice on LVI on April 21, 2015 alleging that the LVI Financial Statements were materially misstated because of improper accounting for ongoing jobs.[26] The Contribution Agreement required the parties "to cooperate and assist in all reasonable respects regarding the investigation and resolution" of a party's claim.[27] Accordingly, the parties engaged in an investigation of NCM's claim notice and this litigation commenced thereafter.[28]

### D. Procedural History

LVI, not NCM, filed the first complaint in connection with the Merger on March 3, 2016 alleging fraud, fraudulent inducement, and unjust enrichment and

---

[23] *See* CC. ¶ 23; Contribution Agreement § 5.2(b).
[24] *See* CC. ¶ 24; Contribution Agreement § 5.4(e).
[25] CC. ¶ 68.
[26] *Id.* at ¶ 25.
[27] *Id.* at ¶ 26.
[28] *Id.*

7

pleading claims for indemnification and a declaratory judgment against NCM with respect to certain representations and warranties NCM made in the Contribution Agreement (the "LVI Complaint"). More specifically, LVI alleges that NCM intentionally overstated earnings and manipulated NCM's accounting in violation of GAAP in such a way that an auditor or purchaser would be unlikely to detect.[29] NCM, in turn, filed its Original Verified Counterclaim on April 4, 2016 and subsequently filed its Amended Verified Counterclaim on August 9, 2016, pleading five counts that are similar to the LVI Complaint. Count I is a claim for fraud against the Counter-Defendants and NorthStar alleging that the Counter-Defendants knowingly made or caused to be made false representations of material facts in the LVI Financial Statements and knowingly misrepresented that the LVI Financial Statements were prepared in accordance with GAAP.[30] Count I alleges further that the Counter-Defendants concealed substantial losses they knew would occur "that were not reflected in the LVI Financial Statements."[31] Count II is a claim for fraudulent inducement against the Counter-Defendants and NorthStar alleging, similar to Count I, that the Counter-Defendants "made or caused to be made false representations of material facts in the LVI Financial Statements" and that the Counter-Defendants misrepresented that the LVI Financial Statements were

---

[29] LVI Complaint ¶ 13.
[30] *See* CC. ¶¶ 71–83.
[31] *See id.* ¶¶ 71–83.

8

prepared in accordance with GAAP. Count II also alleges that the Counter-Defendants "orally and in writing further misrepresent[ed] to NCM that LVI's Jobs were properly reported in the LVI Financial Statements" and concealed substantial losses the Counter-Defendants knew would occur.[32] Count III is a claim for indemnification against LVI alleging that LVI's representations and warranties with respect to the LVI Financial Statements were not accurate and arguing that LVI must indemnify NCM pursuant to the Contribution Agreement.[33] Count IV alleges that Cutrone and State breached their fiduciary duties of care and loyalty to NorthStar and its members, including NCM, by, among other things, knowingly failing to follow GAAP, manipulating NorthStar's financial statements, manipulating costs and revenues of LVI jobs, and inducing LVI to file its claim against NCM. [34] Count V is a derivative claim for breach of fiduciary duty brought by NCM on behalf of NorthStar against Cutrone and State asserting that Cutrone and State's intentional failure to comply with GAAP and manipulation of NorthStar's financial reporting harmed NorthStar.[35]

NCM seeks damages, in an amount to be proven at trial, of not less than $223 million for Counter-Defendants' alleged fraud, and equitable reformation of the

---

[32] *Id.* at ¶¶ 85–97.
[33] *Id.* at ¶¶ 98–106.
[34] *Id.* at ¶¶ 107–113.
[35] *Id.* at ¶¶ 117–120.

Contribution Agreement to lower LVI's allocated equity in NorthStar.[36] NCM also asks for the maximum amount of indemnification under the Contribution Agreement, $15 million. It seeks a finding that Cutrone and State, as officers of NorthStar, breached their fiduciary duties of care and loyalty to NCM and to NorthStar, an order removing State as an officer of NorthStar, and an order compelling both Cutrone and State to forfeit any compensation received from NorthStar while they were in breach of their fiduciary duties to NorthStar.[37]

On August 23, 2016, the Counter-Defendants moved to dismiss the various counts against them. State and Cutrone moved to dismiss Counts I, II, IV, and V under Court of Chancery Rules 8(a), 9(b), 12(b)(6), and 23.1. Cutrone also moved to dismiss all counts against him under Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction. NorthStar moved to dismiss Count V under Rule 23.1. LVI moved to dismiss certain counts against it in part, focusing particularly on NCM's allegations of fraud pertaining to additional jobs that were not alleged in NCM's Original Verified Counterclaim. I heard oral argument on the Counter-Defendants' motions on December 2, 2016. My Letter Opinion follows.

---

[36] *Id.* at Request for Relief.
[37] *Id.*

10

## II. ANALYSIS

The various Counter-Defendants have moved to dismiss certain counts of the Counterclaim pursuant to Rule 12(b)(6) for failure to state a claim. When evaluating a motion to dismiss under 12(b)(6), the Court accepts well-pleaded factual allegations as true, drawing all reasonable inferences in favor of the non-moving party.[38] The Court must deny the motion unless "the [non-moving party] could not recover under any reasonably conceivable set of circumstances susceptible of proof."[39] NCM asserts both fraud and fiduciary duty claims against the Counter-Defendants. I address each in turn below.[40]

### A. The Fraud Claims

Counts I and II assert claims for fraud against Counter-Defendants LVI, State, and Cutrone. The Counter-Defendants moved to dismiss these claims under Rule 9(b), arguing that NCM has failed to plead fraud with the required level of particularity. To claim fraud, a plaintiff must plead, "(i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v)

---

[38] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011).
[39] *Id.*
[40] Cutrone also argues that this Court lacks personal jurisdiction over him in this case. I analyze the issues below generally and address personal jurisdiction at the end of this Letter Opinion.

11

causally related damages."[41]  Court of Chancery Rule 9(b) requires a plaintiff to plead fraud with particularity.[42]  The particularity requirement "means that a plaintiff must allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim."[43]  "The relevant circumstances are the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation."[44]  However, Delaware courts have held that lack of specificity as to date, place, and time are not fatal, *provided that* the pleadings put defendants on sufficient notice of the actual misconduct with which they are charged.[45]

When, as here, a plaintiff's claim for fraud is based on a written contractual representation, it is "relatively easy [for a plaintiff] to plead a particularized claim of fraud."[46]  In such a situation, the plaintiff "can readily identify who made what representations where and when [and] what the defendant gained, which was to induce the plaintiff to enter into the contract."[47]  At that point, the plaintiff "need

---

[41] *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015) (citations omitted).

[42] Ct. Ch. R. 9.

[43] *Prairie Capital III, L.P.*, 132 A.3d at 62 (citations omitted).

[44] *Id.*

[45] *See Yavar Rzayev, LLC v. Roffman*, 2015 WL 5167930, at *4 (Del. Super. Ct. Aug. 31, 2015).

[46] *Prairie Capital III, L.P.*, 132 A.3d at 62.  I note that NCM concedes that it "does not assert fraud claims based on the oral and written representations of State and Cutrone that occurred pre-Merger."  Countercl. Pl's Answering Br. 36–37.

[47] *Id.*

12

only allege facts sufficient to support a reasonable inference that the representations were knowingly false."[48]  Importantly, a defendant's state of mind, such as its knowledge and intent, "may be averred *generally*," or, in other words, a plaintiff "need only point to factual allegations making it reasonably conceivable that the defendants charged with fraud knew the statement was false."[49]  More specifically, where a plaintiff is pleading a claim of fraud "that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it."[50]  NCM has met such a standard here.

NCM alleges in Counts I and II that LVI, with the direct participation of State and Cutrone, intentionally manipulated revenues, costs and profit margins to hide losses and knowingly misrepresented that the LVI Financial Statements were prepared in accordance with GAAP (the "Fraud Claims").[51]  NCM then presents six specific jobs as examples of LVI's "pattern and practice of failing to recognize revenue and losses in accordance with GAAP" (the "Investigated Jobs").[52]  Having allegedly established a pattern and practice, NCM alleges further fraud with respect to other additional jobs, including seventeen

---

[48] *Id.*
[49] *Id.* (internal quotations omitted) (emphasis added).
[50] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 147 (Del. Ch. 2004).
[51] *See* CC. ¶¶ 2, 71, 85.
[52] *See id.* at ¶¶ 45–67; Countercl. Pl's Answering Br. 26.

specific jobs, based on discovering "evidence of the same improprieties in their accounting treatment as NCM found in the Investigated Jobs" (the "Additional Jobs").[53]

As an initial matter, the Counter-Defendants do not dispute, and I assume for purposes of addressing these motions, that the fraud claims here can adequately be brought against State and Cutrone[54] personally as well as against LVI. I turn, then, to the adequacy of the complaint against the Counter-Defendants. Based on the allegations of the Counterclaim, I find that NCM has adequately alleged facts that, if true, demonstrate fraudulent representation by the Counter-Defendants.

The LVI Financial Statements stated certain amounts of profits and losses for particular jobs. After the Merger, profits and losses on those jobs proved lesser and greater, respectively. As a result, the assets contributed by LVI to NorthStar appeared misleadingly more valuable, affecting the allocation of equity in NorthStar between LVI and NCM. At this stage, these allegations are enough for me to infer a misrepresentation in the Contribution Agreement. Therefore, because NCM's fraud claims here are based on a written contractual representation, all that remains

---

[53] *See* CC. ¶ 45; Countercl. Pl's Response to LVI's Motion to Dismiss 2 (Dkt. No. 156).
[54] Cutrone's defense as to personal jurisdiction is addressed separately.

to decide this matter is whether NCM has adequately pled knowledge on the part of State, Cutrone, and LVI.[55]

To my mind, and in light of the low pleading standard at the motion to dismiss stage, NCM has alleged sufficient facts from which I can generally infer knowledge on behalf of the Counter-Defendants. The Counter-Defendants had access to the financial data and chose how to report it. They stood to gain financially from an overstatement of value in their financial statements. Further, NCM alleges that the Counter-Defendants "knew that at least some of the Jobs were misstated on the LVI Financial Statements," and knew before the Merger that "there would be millions of dollars in [undisclosed] losses" on some jobs.[56] NCM also alleges that "[i]nternal correspondence among LVI's management team, including Cutrone and State, show that management knew that losses were imminent, but opted not to take them when they should have been taken . . . to avoid negatively affecting the LVI Financial Statements" before the Merger.[57] These facts are sufficient for me to infer that the truth regarding the LVI financial averments was indeed "knowable" by the Counter-Defendants here and that they were in a position to know it. Accordingly, while NCM may have a difficult climb in proof of its claims at summary judgment or trial,

---

[55] *See Prairie Capital III, L.P.*, 132 A.3d at 62 (explaining that for fraud based on written contractual representations it is easy to "identify who made what representations where and when [and] what the defendant gained").

[56] CC. ¶ 37.

[57] *Id.* at ¶ 42. This correspondence is neither quoted in nor attached to the Counterclaim Complaint, an omission I find curious but, under the minimal pleading standard here, not fatal.

15

NCM has adequately alleged knowledge on the part of the Counter-Defendants.[58] NCM, I find, has sufficiently apprised these parties of the claim against them to satisfy the requirements of Rule 9(b). Thus, NCM's claims for fraud and fraudulent inducement in Counts I and II against State, Cutrone, and LVI survive the Motion to Dismiss.[59]

*B. The Fiduciary Duty Claims*

NCM alleges that State, and formerly Cutrone as well, used their positions as officers at NorthStar to effectively conceal the fraud described in Counts I and II. NCM seeks to bring fiduciary duty claims either directly or derivatively for these actions. These claims, at first glance, appear viable, but on closer examination fail to state a claim as pled.

In Count IV, NCM asserts a direct claim against State and Cutrone, as officers of NorthStar, for violating their fiduciary duties to NCM, as a member of NorthStar.[60] NCM also asserts a derivative claim in Count V on behalf of NorthStar against State and Cutrone for violating their alleged fiduciary duties to NorthStar.

---

[58] *See Prairie Capital III, L.P.*, 132 A.3d at 55–62 (finding allegations of the defendants' knowledge sufficient because knowledge may be averred generally). *See also Oshidar v. Asura Dev. Grp., Inc., et al.*, 2017 WL 1103014, at *7 (Del. Super. Ct. Mar. 24, 2017) (finding the alleged facts "to be minimal, but sufficient, to state claim for fraud"); *Aviation W. Charters, LLC v. Freer*, 2015 WL 5138285, at *7 (Del. Super. Ct. July 2, 2015) (finding sufficient allegation of knowledge where the complaint simply alleged that the defendant knew, among other things, about overstated accounts receivable).

[59] Having found in NCM's favor in this regard, I need not examine the Investigated Jobs. With regard to the scope of the fraud, particularly the Additional Jobs, I find that these issues are more properly addressed in further motions practice rather than at the motion to dismiss stage.

[60] I assume for purposes of this Letter Opinion that default fiduciary duties apply here.

State and Cutrone moved to dismiss both of these Counts pursuant to Rule 12(b)(6) and, along with NorthStar, to dismiss Count V pursuant to Rule 23.1 for failure to make a demand on the NorthStar Board.

### 1. NCM fails to state a direct claim with respect to Count IV

As our Supreme Court recently clarified,

> "whether a claim is [direct or derivative] must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?  In addition, to prove that a claim is direct, a plaintiff must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[61]

In Count IV, NCM alleges that State and Cutrone, as CEO and CFO of NorthStar, respectively, owed fiduciary duties "to NorthStar and its members, including NCM."[62]  According to NCM, State and Cutrone breached these duties by:

a) Knowingly failing to follow GAAP for the purpose of manipulating NorthStar's revenues, assets and profits on NorthStar's financial statements to the detriment of NCM and to encourage and support LVI to assert claims against NCM;
b) Manipulating costs and revenues to artificially preserve profit margins on LVI legacy jobs;
c) Shifting costs between unrelated jobs to manipulate profits and losses on jobs in order to have LVI legacy jobs appear more profitable and NCM legacy jobs appear less profitable;

---

[61] *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 2016 WL 7380418, at *10 (Del. 2016) (internal quotations omitted) (emphasis in original) (citing *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033, 1039 (Del. 2004)).
[62] CC. ¶ 112.

17

d) Carrying [certain debt] on NorthStar's books that they know [is] not likely to result in cash collections in order to make LVI legacy jobs appear more profitable;

e) Orchestrating a fraudulent "look back" analysis designed to manipulate NorthStar's reported profits and losses and favor LVI over NCM in their current dispute relating to their Merger by devaluing the jobs NCM contributed to the Merger all for the purpose of covering up their own mismanagement and supporting LVI's claims in this action; and

f) Inducing LVI to file its claim against NCM.[63]

NCM argues that these alleged actions caused "direct injury to NCM by devaluing the jobs NCM contributed to NorthStar," causing LVI to sue NCM and damage NCM's reputation in the process, and by "providing a pretext" for removing NCM's appointee to the co-CEO position of NorthStar.[64] NCM asks that I find that State and Cutrone, as officers of NorthStar, breached their fiduciary duties, but seeks only limited resulting relief: that I remove State as an officer of NorthStar. After examining NCM's claim here, as set out in detail below, I find that NCM cannot escape the fact that its allegations in Count IV involve both injury—and potential relief—to NorthStar.

NCM's allegations in paragraphs 113(a)-(d) of its Counterclaim Complaint, set out in full above, involve allegations that State and Cutrone manipulated NorthStar's financial statements after the Merger. This is a harm to NorthStar and, if true, would result in a breach of fiduciary duty to NorthStar, not solely NCM.

---

[63] *Id.* at ¶ 113.
[64] *Id.* at ¶ 114.

Moreover, to the extent State and Cutrone orchestrated a "fraudulent 'look back' analysis" and devalued "jobs NCM contributed to the [M]erger" that formed NorthStar, once again, this action would result in injury to NorthStar.

The derivative nature of NCM's claim here is convincingly demonstrated by the inescapable fact that all relief would run to NorthStar. Should I find in its favor on Count IV, NCM seeks as relief that I remove State as an officer of NorthStar.[65] NCM argues that it would "uniquely benefit" from State's discharge because his discharge would prevent State from "using his position of power to continue his discriminatory conduct aimed at NCM."[66] To my mind, however, the benefit of removing an officer alleged to be a faithless fiduciary runs to NorthStar directly, and only indirectly to any of NorthStar's members. I also note that NCM seeks this very same relief in its derivative claim on behalf of NorthStar in Count V.[67]

In briefing, NCM attempts to recast its allegations as amounting to selective discrimination by State and Cutrone against NCM and to argue that this alleged conduct was "directed at NCM and caused NCM harm independent of any harm suffered by the company."[68] NCM then cites to three cases for the proposition that

---

[65] *Id.* at ¶ 116.
[66] Countercl. Pl's Answering Br. 40.
[67] *See* CC. ¶ 130(c).
[68] Countercl. Pl's Answering Br. 39.

discrimination against stockholders amounts to quintessential direct claims.[69] With respect to the direct claims in each of those cases, however, the plaintiffs sought damages for themselves[70] and this Court found no harm to the respective companies at issue.[71] I therefore find each case inapposite here. NCM has, of course, brought a claim for the behavior of State and Cutrone, sounding in fraud, not as fiduciaries but as contractual counterparties. NCM's real complaint in Count IV is that State and Cutrone used their positions, post-Merger, to try to cover up the fraud alleged against them in Counts I and II. To the extent State and Cutrone did so, relief may flow to NCM from the fraud Counts, but the Counterclaim does not state an independent direct breach of fiduciary duty claim against State and Cutrone on behalf of NCM.

Important to my analysis is that, in Count IV, NCM is *not* seeking relief in damages for actions of its fiduciaries at NorthStar on the ground that they financially injured NCM. The only damages alleged in the Counterclaim Complaint involve the fraud allegations of Counts I and II, recovery for which is not sought in this Count IV. Instead, this Count effectively seeks only an order enjoining the directors

[69] *Id.* at 39–40 (citing *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067 (Del. Ch. Jul. 13, 2005); *Acker v. Transurgical, Inc.*, 2004 WL 1230945 (Del. Ch. Apr. 22, 2004); *Gatz v. Ponsoldt*, 2004 WL 3029868 (Del. Ch. Nov. 5, 2004)).

[70] The exception is *Deephaven*, which did not involve a damages action but rather a Section 220 action.

[71] *See Deephaven*, 2005 WL 1713067, at *8; *Acker*, 2004 WL 1230945, at *1; *Gatz*, 2004 WL 3029868, at *8.

of NorthStar to discharge State as CEO, an action that the Board would clearly be taking *on behalf of NorthStar*. Accordingly, I find that NCM fails to plead a direct claim in Count IV.[72]

> 2. NCM has failed to show that demand would be futile under Rule 23.1 as to Count V

NCM asserts a derivative claim on behalf of NorthStar, mirroring the direct fiduciary duty claim addressed above, "alleging that State and Cutrone, as managers of NorthStar, breached their duty of good faith, trust, loyalty, and due care to the company by knowingly failing to follow GAAP and engaging in improper accounting practices that resulted in misstating NorthStar's financial condition to NorthStar's detriment and concealing their own wrongdoing."[73] NCM seeks an order directing State's discharge, and the restitution to NorthStar of compensation NorthStar has paid to Cutrone and State. The Counter-Defendants argue that NCM has not met its pleading burden under Rule 23.1 to show demand futility. I agree.

Before proceeding with this analysis, it is worth examining the nature of the "derivative" action NCM seeks to advance on behalf of NorthStar. NCM argues that a majority of NorthStar directors are aligned with LVI, excusing demand. This might be persuasive if NCM were seeking to sue *LVI* on behalf of NorthStar (and if

---

[72] NCM also alleges a direct harm to NCM for "inducing" LVI to sue NCM in this matter. I confess that I do not understand how this allegation gives rise to a breach-of-fiduciary-duty claim, or what relief would flow therefrom.
[73] Countercl. Pl's Answering Br. 38.

21

there were some underlying rationale for such an action, which is absent from the Counterclaim Complaint). Here, however, NCM seeks to act, on behalf of NorthStar, to punish State and Catrone for the fraud against NCM.

If a stockholder believes an officer is breaching fiduciary duties, and should be removed, she may bring that to the attention of the board of directors via a demand. It is a fundamental tenant under Delaware law that "directors, rather than shareholders, manage the business and affairs of the corporation."[74] Accordingly, Delaware Court of Chancery Rule 23.1 contains a demand requirement that plaintiffs must satisfy to pursue a derivative claim. An "individual stockholder intending to bring a suit derivatively on behalf of his corporation [must] first make a demand that the board of directors pursue the cause of action, or demonstrate that the board, as then constituted, would be incapable of acting in the corporate interest, thus excusing demand."[75] Rule 23.1 requires that a plaintiff seeking to proceed derivatively must "*allege with particularity* the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action *or for not making the effort*."[76] Where, as here, a "plaintiff forgoes demand and seeks to proceed with derivative litigation

---

[74] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[75] *Park Emps.' & Ret. Bd. Emps.' Annuity & Benefit Fund of Chicago v. Smith*, 2016 WL 3223395, at *1 (Del. Ch. May 31, 2016).

[76] Ct. Ch. R. 23.1 (emphasis added).

nonetheless, the action will be dismissed unless the plaintiff can demonstrate that demand is futile."[77]  Thus, to avoid dismissal under Rule 23.1, NCM "must allege with particularity . . . the reasons . . . for not making the effort [to make the litigation demand], and the Court, in turn, must determine based on those allegations whether the board is able to exercise its business judgment in determining if it is in the corporate interest to pursue the litigation."[78]

Here, the sole ground alleged to excuse demand is that the directors are not disinterested in the subject of the demand.[79]  "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders [or] where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders."[80]  In other words, "the plaintiff must show that the alleged benefit [or detriment] was significant enough in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties."[81]  Moreover, a "fact-intensive, director-by-director analysis [is] required to meet the pleading standard for demand futility."[82]

---

[77] *In re Duke Energy Corp. Derivative Litig.*, 2016 WL 4543788, at *11 (Del. Ch. Aug. 31, 2016).
[78] *Id.* at *14 (internal quotations omitted).
[79] Pl's Answering Br. 42 (citing *Beneville v. York*, 769 A.2d 80, 85–86 (Del. Ch. 2000)).
[80] *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) (citations omitted).
[81] *Robotti & Co. v. Liddell*, 2010 WL 157474, at *12 (Del. Ch. Jan. 14, 2010).
[82] *Postorivo v. AG Paintball Holdings, Inc.*, 2008 WL 553205, at *6 (Del. Ch. Feb. 29, 2008).

NCM seeks, derivatively, an order removing State as an officer and restitution from State and Cutrone. According to NCM, four of the eleven Board members are NCM representatives and the remaining seven board members are all "former LVI management who, except for one, have ownership interests in LVI."[83] NCM also alleges that LVI controls NorthStar, that a "majority of the Board has an interest in LVI and stands to personally benefit from Cutrone and State's fraudulent activity" and that "[m]any of Cutrone and State's breaches have benefitted LVI."[84] Finally, according to NCM, making demand on the NorthStar Board would be futile because asking the Board to "sue State and Cutrone would be like asking the majority members of the NorthStar Board to sue themselves."[85] This is a non-sequitur; the relief sought here would *not* flow from LVI.

NCM's cursory allegations here fall short of the particularity requirements of 23.1. NCM alleges "nothing close to the fact-intensive, director-by-director analysis required to plead demand futility."[86] As an initial matter, NCM fails even to mention any of the directors individually, much less describe how the decision whether or not to sue State and Cutrone for restitution of their salary from NorthStar (or otherwise discipline State) would have a detrimental material impact on any one of

---

[83] CC. ¶ 123.
[84] *Id.* at ¶¶ 123–125.
[85] *Id.* at ¶ 124.
[86] *Postorivo*, 2008 WL 553205, at *6.

24

them.  Instead, NCM refers to one broad group of seven board members and claims that they have an interest in LVI and stand to personally benefit from the actions of Cutrone and State.[87]  NCM fails to describe the facts of that alleged interest and how it is material to each director.  In fact, rather than a direct ownership interest, NCM in briefing states that six directors *represent* owners of LVI and does not offer any more details about the intricacies of this representation.[88]  NCM's offhand allegation that all former LVI directors now on the Board were engaged in a "conspiracy" against NCM is also unpersuasive as to the Board's ability to bring its business judgment to bear.

State, of course, is a conflicted director.  It is certainly conceivable that individual directors, through long-standing relationships with State or LVI, may be incapable of following their business judgment in a way averse to State.[89]  NCM has failed to make such a pleading here, however.  NCM fails to allege that State dominates the other directors, nor does NCM point to any longstanding personal or business relationships between State—or Cutrone, for that matter—and any other board members sufficient to cause those members to be unable to exercise their business judgment here.  Finally, NCM points out that NorthStar "and its LVI aligned Board members" have ignored its requests—short of formal demands—to

---

[87] CC. ¶ 125.

[88] Countercl. Pl's Answering Br. 42.

[89] *See Delaware Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 (Del. 2015).

25

remove State or investigate LVI.[90]  This approaches tautology: "it is the Board's inaction in most every case which is the *raison d'etre* for Rule 23.1."[91]

In sum, NCM has alleged, but without particularity, that a majority of NorthStar directors are conflicted with respect to a demand to sue *LVI*.  Even if so, NCM has failed to allege that the directors are conflicted with respect to a suit against *State and Cutrone*, which is the action they seek to bring derivatively.  Under the stringent requirements of Rule 23.1, therefore, the derivative portion of the Counterclaim Complaint must be dismissed.

## *C. Personal Jurisdiction*

In light of my findings above, the parties should indicate to me whether further argument or citation to the record is necessary before I decide whether this Court has personal jurisdiction over Cutrone in this matter.

## III. CONCLUSION

For the reasons stated above, the Counter-Defendants' Motion to Dismiss is denied as to Counts I and II of the Counterclaim Complaint.  Counts IV and V are

---

[90] *See* CC. ¶¶ 126, 127.  NCM also alleges that NorthStar's management consists of former LVI management who have ownership interests in LVI and have benefitted from State and Cutrone's actions. *See* CC. ¶ 123.  NCM fails to explain how management's interest in LVI is relevant, as any demand futility analysis focuses on whether the board of *directors*, not management, can exercise its business judgment. *See, e.g., Park Emps.' & Ret. Bd. Emps.' Annuity & Benefit Fund of Chicago*, 2016 WL 3223395, at *1.
[91] *Richardson v. Graves*, 1983 WL 21109, at *3 (Del. Ch. June 17, 1983) (emphasis in original). *See also id.* at *3 (noting that "[t]he failure to sue . . . is not enough to demonstrate an 'interestedness' sufficient to sterilize the discretion of the remaining members of the board").

dismissed for failure to state a direct claim and failure to plead demand futility under Rule 23.1, respectively. Counsel should provide an appropriate form of order consistent with this Letter Opinion.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III