# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MELVYN KLEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0862-AGB |
| | ) | |
| H.I.G. CAPITAL, L.L.C.; H.I.G. | ) | |
| SURGERY CENTERS, LLC; H.I.G. | ) | |
| BAYSIDE DEBT & LBO FUND II; | ) | |
| BCPE SEMINOLE HOLDINGS LP; | ) | |
| BAIN CAPITAL INVESTORS, LLC; | ) | |
| BAIN CAPITAL PRIVATE EQUITY, | ) | |
| LP; MICHAEL DOYLE; MATTHEW | ) | |
| LOZOW; ADAM FEINSTEIN; | ) | |
| TERESA DELUCA; and BRENT | ) | |
| TURNER, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SURGERY PARTNERS, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 13, 2018
Date Decided: December 19, 2018

Kurt M. Heyman and Melissa N. Donimirski, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Jason M. Leviton and Joel A. Fleming, BLOCK & LEVITON LLP, Boston, Massachusetts, *Attorneys for Plaintiff*.

Stephen C. Norman and Jaclyn C. Levy, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; David B. Hennes, Martin J. Crisp, and Paul S. Kellogg, ROPES & GRAY LLP, New York, New York, *Attorneys for Nominal Defendant Surgery Partners, Inc. and Defendant Michael Doyle*.

Elena C. Norman and Benjamin M. Potts, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, *Attorneys for Defendants H.I.G. Bayside Debt & LBO Fund II, H.I.G. Capital, LLC, and H.I.G. Surgery Centers, LLC*.

David E. Ross and S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Yosef J. Riemer, P.C., Devora W. Allon, and Alexandra Strang, KIRKLAND & ELLIS LLP, New York, New York, *Attorneys for Defendants Bain Capital Investors, LLC, Bain Capital Private Equity, LP, and BCPE Seminole Holdings LP*.

**BOUCHARD, C.**

In May 2017, Surgery Partners, Inc. and its controlling stockholder (HIG) simultaneously entered into three interrelated transactions. First, Surgery Partners agreed to purchase National Surgical Healthcare from a third party. Second, HIG agreed to sell its 54% common stock stake in Surgery Partners to an affiliate of Bain Capital Private Equity, LP for a per-share price that reflected a premium over the market price at the time. Third, Surgery Partners agreed to issue to Bain shares of a newly created class of Series A preferred stock that voted with its common stock, paid a 10% dividend, and contained other allegedly attractive terms, including a conversion feature that already was "near" or "in" the money.

Critically, each of the three transactions was conditioned on the others. This meant that the sale of HIG's control position to Bain would not happen unless Bain was satisfied with the terms of the Series A preferred stock. This created a dynamic whereby HIG allegedly was incentivized to provide Bain favorable terms on the Series A preferred stock in order to maximize the price at which HIG could liquidate and exit its investment in Surgery Partners.

In December 2017, a few months after the three transactions closed, a stockholder plaintiff (Melvyn Klein) filed this action challenging the fairness of the Series A preferred stock issuance to Bain. His complaint focuses on the incentives HIG and Bain had to "scratch each other's back" and criticizes the process surrounding the deal negotiations, including that (i) Bain used the same counsel and

1

accounting advisor as Surgery Partners during the negotiations, (ii) Surgery Partners did not utilize a special committee to exclude HIG's representative on the board from negotiations concerning the Series A preferred stock despite the conflict HIG faced with respect to selling its control position to Bain, (iii) no stockholder other than HIG had any say in approving any of the transactions, and (iv) Surgery Partners' financial advisor did not provide a fairness opinion concerning the consideration paid for the Series A preferred stock and stood to benefit from the transactions by providing financing for Surgery Partners' acquisition of National Surgical Healthcare in addition to receiving an advisory fee on the deal.

Klein's complaint asserts eight claims. Four of them are pled as direct claims and the other four are pled as derivative claims. The legal theories underlying each of the direct claims mirror the derivative claims. Defendants have moved to dismiss all of the claims under Court of Chancery Rule 23.1 for failure to make a demand on Surgery Partners' board before filing suit and under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. For the reasons explained below, the court concludes that six of the claims must be dismissed but that the other two will survive.

Three subsidiary conclusions drive this result. First, the court rejects plaintiff's contention that his admittedly derivative claims fall within the paradigm

2

our Supreme Court recognized in *Gentile v. Rossette*[1] for asserting claims "dually" as both direct and derivative claims, thus all of the direct claims must be dismissed. Second, plaintiff has pled sufficient particularized facts to raise a reasonable doubt about the independence and disinterestedness of a majority of the directors on Surgery Partners' board when the complaint was filed, thus plaintiff is excused for failing to make a demand on the board. Third, the complaint states derivative claims for (i) breach of fiduciary duty against HIG as Surgery Partners' controlling stockholder on the theory that it received a unique benefit and was conflicted in connection with the transactions, thereby presumptively triggering entire fairness review of the Series A preferred stock transaction, and (ii) aiding and abetting a breach of fiduciary duty against Bain. The reasoning for these conclusions follows.

## I. BACKGROUND

The facts recited herein are based on facts pled in the Verified Class Action and Derivative Complaint (the "Complaint") and documents incorporated therein.[2] Any additional facts are either not subject to reasonable dispute or are subject to judicial notice.

---

[1] 906 A.2d 91 (Del. 2006).

[2] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss) (citations and internal quotation marks omitted).

3

## A.    The Parties

Nominal Defendant Surgery Partners, Inc. ("Surgery Partners" or the "Company") is a Delaware corporation headquartered in Nashville, Tennessee that provides surgical services across twenty-nine states. The Company is publicly listed, and its shares trade on NASDAQ. Plaintiff Melvyn Klein alleges he has been a stockholder of the Company since at least October 1, 2015.[3]

Defendant H.I.G. Capital, LLC, a Delaware limited liability company, is a private investment management firm that focuses on private equity, venture capital, debit/credit, real estate, and public equity investments. Defendants H.I.G. Surgery Centers, LLC and H.I.G. Bayside Debt & LBO Fund II are Delaware entities affiliated with and managed by H.I.G. Capital, LLC. For simplicity, these three entities will be referred to collectively as "HIG." HIG owned 54.2% of the Company's outstanding common stock as of April 17, 2017.[4]

Defendant Bain Capital Private Equity, LP, a Delaware limited partnership, is an investment advisory firm focused on advising on private equity investments, including leveraged acquisitions and recapitalizations, investments in growth companies, turnarounds, and traditional buyouts. The Complaint names as defendants two other entities affiliated with Bain Capital Private Equity, LP: BCPE

---

[3] Compl. ¶ 6.

[4] *Id.* ¶ 23.

4

Seminole Holdings LP and Bain Capital Investors, LLC.  For simplicity, these three entities will be referred to collectively as "Bain."

The individual defendants (the "Director Defendants") consist of the five members of the Company's board of directors (the "Board") when the three transactions described below were entered into on May 9, 2017:  Teresa DeLuca, Michael Doyle, Adam Feinstein, Matthew Lozow, and Brent Turner.[5]  Doyle has been a director of Surgery Partners since August 2012 and served as its Chief Executive Officer from April 2015 through September 7, 2017.[6]  He continued to serve on the Board after stepping down as CEO.[7]  Turner has served as a director of Surgery Partners since December 2015 and as the President of Acadia Healthcare Company since 2011.[8]  Lozow is a Managing Director of H.I.G. Capital and was a director of Surgery Partners from April 2015 through August 31, 2017.[9]  Feinstein and DeLuca have been directors of Surgery Partners since August 2015 and September 2016, respectively.[10]

---

[5] *Id.* ¶ 24.

[6] *Id.* ¶ 13.

[7] *Id*.

[8] *Id.* ¶ 14.

[9] *Id.* ¶ 15.

[10] *Id.* ¶¶ 16-17.

## B.       Approval of the Transactions

On May 3, 2007, Christopher Laitala, a former Managing Director of H.I.G. Capital and the Chairman of the Board of Surgery Partners at the time, "abruptly" resigned from the Board.[11]  Less than one week later, on May 9, the Board—then consisting of Doyle, Lozow, Feinstein, DeLuca, and Turner—approved and the Company simultaneously entered into three transactions (the "Transactions").[12]

In the first transaction, Surgery Partners agreed to acquire National Surgical Healthcare from a third party (Irving Place Capital) for approximately $760 million (the "NSH Acquisition").[13] In the second transaction, HIG agreed to sell all of its common shares of Surgery Partners to Bain at a price of $19 per share in cash for a total purchase price of approximately $502.7 million (the "HIG Share Sale").[14]  In the third transaction, Surgery Partners agreed to issue and sell to Bain 310,000 shares of a newly created class of Series A preferred stock of the Company (the "Preferred Stock") at a price of $1,000 per share, for a total price of $310 million (the "Bain Share Issuance").[15]

---

[11] *Id.* ¶ 19.

[12] *Id.* ¶¶ 1, 33, 38.

[13] *Id.* ¶ 1(a).

[14] *Id.* ¶ 1(b).

[15] *Id.* ¶ 1(c).

The Transactions were interrelated and dependent on each other. Specifically, the NSH Acquisition was conditioned on the completion of both the Bain Share Issuance and the HIG Share Sale, and the HIG Share Sale was conditioned on the Bain Share Issuance.[16]

The Preferred Stock accrues dividends at a rate of 10%, compounding quarterly, and is convertible into common stock at a price of $19 per share.[17] The Preferred Stock is senior to the Company's common stock and its holders vote with the common stockholders together as a single class.[18] As long as Bain retains 50% of the shares of the Preferred Stock issued in the Bain Share Issuance, its affirmative vote is required before the Company can pay dividends other than dividends on the Preferred Stock; enter into a recapitalization, share exchange, or merger; increase its indebtedness; or modify any provision of the Company's organizational documents that would adversely affect the powers of the Preferred Stock, among other things.[19] The Preferred Stock, together with the common stock Bain acquired from HIG, represents approximately 66% of the voting power of all classes of capital stock of the Company.[20]

---

[16] *Id.* ¶¶ 36-37.

[17] *Id.* ¶ 1(c).

[18] *Id.* ¶ 34.

[19] *Id.*

[20] *Id.*

According to the Complaint, the implied call option provided by the convertible feature of the Preferred Stock already was "near the money/in the money" when the Transactions were announced.[21]  On May 9, 2017, the date the Board approved the Transactions, shares of Surgery Partners closed at $18.20 per share.[22]  The next day, when the Transactions were announced, the shares closed at $20.95 per share.[23]  The Complaint alleges that the dividend rate on the Preferred Stock was "extraordinarily favorable," as the Company had issued $400 million of senior unsecured notes in March 2016 with an interest rate of 8.875%.[24]

No special committee was appointed to negotiate or approve the Transactions.[25]  The Company's public filings state that all three Transactions were approved by the Board, without mentioning that any of the five directors on the Board at that time had abstained from voting.[26]  Despite this lack of public disclosure, HIG and the Director Defendants contend—and plaintiff does not object to the court considering for purposes of the pending motions—that one of the directors who was affiliated with HIG (Lozow) abstained from voting on the

---

[21] *Id.* ¶ 1(c) (internal quotation marks omitted).

[22] *Id.*

[23] *Id.*

[24] *Id.* ¶ 5.

[25] *Id.* ¶ 40.

[26] *Id.* ¶ 38.

8

Transactions.[27]  The public stockholders were not asked to vote on the Transactions, which HIG approved by written consent as the Company's majority stockholder.[28]

The Complaint alleges that various firms that provided advice on the Transactions had conflicts of interest.  Ropes & Gray LLP, which was Bain's long-time counsel, advised both Surgery Partners and Bain on the Transactions.[29]  Allegedly in recognition of this conflict, Bain also engaged Kirkland & Ellis LLP as its counsel.[30]  PwC LLP represented both Bain and Surgery Partners as an accounting advisor with respect to the Transactions.[31]  Jefferies LLC served as the Company's exclusive financial advisor, but it did not issue a fairness opinion and stood to benefit from the Transactions by providing financing for the NSH Acquisition and earning fees for arranging a $1.29 billion senior credit term loan and a $75 million revolving credit facility.[32]

---

[27] HIG Defs.' Opening Br. 4 n.7; Dir. Defs.' Opening Br. 42 n.15; Pl.'s Opp'n Br. 9 n.22.

[28] Compl. ¶ 4.

[29] *Id.* ¶¶ 4, 43.

[30] *Id.* ¶ 45.

[31] *Id.* ¶ 4.

[32] *Id.* ¶ 42.

## C. Events after the Transactions Were Approved

During a May 10, 2017 earnings call, an analyst expressed puzzlement over the Company's decision to finance the NSH Acquisition through the Bain Share Issuance rather than issuing common stock, asking:

> did you guys contemplate issuing equity, just straight out equity? Or did Irving—did the buyers not want equity? Or was it just because of the competitive nature that you had to pay cash? I'm just curious, again, going back to the deleveraging or the opportunity that arose that could have led to a deleveraging.[33]

Doyle provided a "rambling response," stating, in relevant part, that:

> the competitive nature of the transaction and the certainty of outcome from our perspective and from the other side's perspective or—again, there's a lot of things that come into play, and it was a pretty complicated process with, as you take a look at us bringing in a new long-term partner in Bain Capital Private Equity, replacing H.I.G., putting in a preferred and acquiring a company.[34]

The Transactions closed on August 31, 2017. Upon the closing, Lozow resigned from the Board and two Managing Directors of Bain were elected as directors: Christopher Gordon and T. Devin O'Reilly.[35] After the closing, Bain held approximately 65.7% of the Company's outstanding voting stock, and publicly described itself as "the controlling stockholder of [Surgery Partners]."[36]

---

[33] *Id.* ¶ 48.

[34] *Id.* ¶ 49.

[35] *Id.* ¶¶ 21-22, 50.

[36] *Id.* ¶ 28.

On September 7, 2017, the Company announced that Doyle would be stepping down as CEO, but would remain on the Board.[37] Doyle and the Company entered into a consulting services agreement under which Doyle consulted for six months in exchange for a total fee of $275,000.[38] Doyle also entered into a severance agreement under which he received, among other things, his salary through the date of his resignation, $550,000 in cash severance to be paid over a twelve month period, a pro-rata portion of the bonus he would have earned in 2017, and COBRA premiums for a year.[39]

Clifford Adlerz replaced Doyle as CEO of Surgery Partners on September 7, 2017.[40] Adlerz, who previously provided consulting services to Bain, became a member of the Board on October 30, 2017.[41]

## II. PROCEDURAL HISTORY

On December 4, 2017, Klein filed this action.[42] The Complaint contains eight claims. Counts I-IV are pled as direct claims and Counts V-VIII are pled as

---

[37] *Id.* ¶ 50.

[38] *Id.* ¶ 51.

[39] *Id.*

[40] *Id.* ¶ 50.

[41] *Id.* ¶ 20.

[42] Before filing suit, Klein made a demand under 8 *Del. C.* § 220 to inspect books and records concerning the Transactions, but he declined to pursue a Section 220 action and filed this action instead after the Company rejected the demand and refused to produce any documents. *See* Dir. Defs.' Opening Br. 10 n.4; *see also* Pl.'s Opp'n Br. 9 n.22.

derivative claims. The legal theories underlying each of the four direct claims mirror each of the four derivative claims.

Counts I and V assert claims for breach of fiduciary duty against the Director Defendants for "entering into the Transactions without ensuring that the Bain Capital Share Issuance was entirely fair."[43] Counts II and VI assert claims for breach of fiduciary duty against Bain and HIG as an alleged control group "[a]t the time the Transactions were agreed to" for "entering into the Bain Capital Share Issuance, a conflicted transaction that was not entirely fair."[44] Counts III and VII assert, in the alternative to the breach of fiduciary duty claims asserted against HIG in Counts II and VI, respectively, claims for breach of fiduciary duty against HIG as "the sole controlling stockholder" for "causing the Company to enter into the Bain Capital Share Issuance, a conflicted transaction that was not entirely fair."[45] Counts IV and VIII assert, in the alternative to the breach of fiduciary duty claims asserted against Bain in Counts II and VI, respectively, that Bain aided and abetted breaches of fiduciary duty by HIG and the Director Defendants.[46]

On March 5, 2018, defendants filed their opening briefs in support of motions they had filed several months earlier to dismiss the Complaint under Court of

---

[43] Compl. ¶¶ 66 (Count I), 84 (Count V).

[44] *Id.* ¶¶ 69-70 (Count II), 87-88 (Count VI).

[45] *Id.* ¶¶ 73-74 (Count III), 91-92 (Count VII).

[46] *Id.* ¶¶ 77-80 (Count IV), 95-97 (Count VIII).

12

Chancery Rules 12(b)(6) and 23.1. On April 17, 2018, plaintiff voluntarily dismissed DeLuca and Feinstein from this action without prejudice.[47] On September 17, 2018, a few days after oral argument on the pending motions, the court entered an order approving a stipulation the parties had filed to dismiss Lozow and Turner from this action with prejudice only as to the plaintiff in this action.[48]

## III.  ANALYSIS

The standard for deciding a motion to dismiss under Court of Chancery Rule 12(b)(6) is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [iv] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[49]

Under Court of Chancery Rule 23.1, a derivative claim will be dismissed for lack of standing unless plaintiffs either "(1) make a pre-suit demand by presenting the allegations to the corporation's directors, requesting that they bring suit, and

---

[47] Dkt. 32.

[48] Dkt. 46.

[49] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal quotation marks omitted).

showing that they wrongfully refused to do so, or (2) plead facts showing that demand upon the board would have been futile."[50]

As the above recitation of his claims demonstrates, Klein does not challenge the NSH Acquisition, which involved the Company's acquisition of a healthcare business from a third party. Nor does he directly challenge the HIG Share Sale, in the sense of seeking any relief concerning the transfer to Bain of HIG's majority ownership of common stock in Surgery Partners. Rather, the Complaint focuses on the Bain Share Issuance.[51] More specifically, the gravamen of the Complaint is that Bain paid less than fair value to the Company to acquire the Preferred Stock and that HIG "had a strong economic motivation to make the terms of the Bain Capital Share Issuance appealing to Bain Capital because Bain Capital would, rationally, be willing to pay more for HIG's common stock as the terms of the Bain Capital Share Issuance became more favorable."[52]

The following analysis of the eight claims in the Complaint proceeds in three parts. The court begins by determining whether Counts I-IV properly can be brought as direct claims, or whether they are purely derivative claims. The court next

---

[50] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (citing *Stone v. Ritter*, 911 A.2d 362, 366-67 (Del. 2006)).

[51] *See* Compl. ¶ 66 (alleging that defendants violated their fiduciary duties by "entering into the Transactions without ensuring that the Bain Capital Share Issuance was entirely fair"); *see also id.* ¶¶ 70, 74, 84, 88, 92 (same).

[52] *Id.* ¶ 27.

considers whether demand would be futile with respect to the derivative claims (Counts V-VIII) and then, after finding that demand would be futile in this case, analyzes defendants' arguments for dismissal under Rule 12(b)(6) for failure to state a claim for relief.

### A. Counts I-IV of the Complaint Must Be Dismissed Because They Cannot Be Brought as Direct Claims.

To determine whether a claim is direct or derivative, the court must consider "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[53] "In the typical corporate overpayment case, a claim against the corporation's fiduciaries for redress is regarded as exclusively derivative, irrespective of whether the currency or form of overpayment is cash or the corporation's stock."[54] This is because "any dilution in value of the corporation's stock is merely the unavoidable result . . . of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction."[55]

Klein's claims are a classic form of an "overpayment" claim. He disputes the fairness of the consideration paid for the Preferred Stock given its terms, in particular

---

[53] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

[54] *Gentile*, 906 A.2d at 99.

[55] *Id.*

its dividend rate and the implied call option value of its conversion feature. The Complaint alleges, for example, that "the Preferred Stock had significant option value because the conversion price was already lower than the trading price. Yet Bain Capital also got an extraordinarily favorable dividend rate of 10%."[56] Such claims are quintessentially derivative.[57] Indeed, Klein does not contend that his claims are not derivative,[58] he just argues that they also can be brought as direct claims under the "transactional paradigm" recognized in *Gentile v. Rosette*.[59]

In *Gentile,* our Supreme Court recognized "a species of corporate overpayment claim" that can be both direct and derivative in nature:

> A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders. Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative.
>
> But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares

---

[56] Compl. ¶ 5; *see also id.* ¶ 47.

[57] *See Gentile*, 906 A.2d at 99 ("Normally, claims of corporate overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative.").

[58] Tr. 82 (Sept. 13, 2018).

[59] 906 A.2d at 99.

representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited.[60]

In short, the harm *Gentile* seeks to remedy arises "when a controlling stockholder, with sufficient power to manipulate the corporate processes, engineers a dilutive transaction whereby that stockholder receives an exclusive benefit of increased equity ownership and voting power for inadequate consideration."[61]

Significantly, our Supreme Court recently construed the *Gentile* doctrine narrowly in *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*.[62] In that case, a limited partner argued that its claim, which alleged overpayments by the partnership to the controlling general partner, fell within the *Gentile* framework because the overpayments diluted the minority limited partners' economic interests but

---

[60] *Id.* at 99-100 (internal footnotes omitted).

[61] *Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. 2008).

[62] 152 A.3d 1248 (Del. 2016).

concededly were "not coupled with any voting rights dilution."[63]   The Supreme

Court refused to apply *Gentile* in that circumstance, explaining:

> *Gentile* concerned a controlling shareholder and transactions that
> resulted in an improper transfer of both economic value *and* voting
> power from the minority stockholders to the controlling stockholder.
> [Plaintiff's] claim does not satisfy the unique circumstances presented
> by the *Gentile* species of corporate overpayment claims.[64]

The Court further explained, "[w]e decline the invitation to further expand the

universe of claims that can be asserted 'dually' to hold here that the extraction of

solely economic value from the minority by a controlling stockholder constitutes

direct injury."[65]   To do so, the Court reasoned, "would deviate from the

*Tooley* framework and largely swallow the rule that claims of corporate

overpayment are derivative."[66]   In a concurrence, Chief Justice Strine went further

and suggested that *Gentile* should be overruled, at least in certain respects.[67]

     The Supreme Court's ruling in *El Paso* was not made lightly.  To the contrary,

the ruling resulted in the reversal of a $171 million judgment for damages because

---

[63] *Id.* at 1252-53, 1264.

[64] *Id.* at 1263-64 (emphasis in original) (internal quotation marks and citations omitted).

[65] *Id.* at 1264.

[66] *Id.* (internal quotation marks and citations omitted).

[67] *See id.* at 1266 (Strine, C.J., concurring) ("*Gentile* cannot be reconciled with the strong weight of our precedent and it ought to be overruled, to the extent that it allows for a direct claim in the dilution context when the issuance of stock does not involve subjecting an entity whose voting power was held by a diversified group of public equity holders to the control of a particular interest.").

it ensured that plaintiff's standing to maintain a derivative claim was extinguished when the limited partnership was acquired in a merger "after the trial was completed and before any judicial ruling on the merits" in what the high court described as a "troubling case."[68]

In the wake of *El Paso*, this court has exercised caution in applying the *Gentile* framework, commenting in one case that "[w]hether *Gentile* is still good law is debatable"[69] and finding in another that "*Gentile* must be limited to its facts."[70] "Whatever the ultimate fate of the *Gentile* paradigm may be, the current state of the law for the doctrine to apply is that (i) there must be a controlling stockholder or control group; and (ii) the challenged transaction must result 'in an improper transfer of both economic value *and* voting power from the minority stockholders to the controlling stockholder.'"[71]

Defendants make a number of arguments against the application of *Gentile* in this case, one of which focuses on the structural reality that *HIG's* ownership interest or voting power was not increased through issuance of the Preferred Stock to *Bain*

---

[68] *Id.* at 1250-52.

[69] *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *26 n.206 (Del. Ch. July 21, 2017), *aff'd*, 2018 WL 1905256 (Del. Apr. 23, 2018).

[70] *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *10 (Del. Ch. July 26, 2018).

[71] *Almond v. Glenhill Advisors LLC*, 2018 WL 3954733, at *24 (Del. Ch. Aug. 17, 2018) (quoting *El Paso*, 152 A.3d at 1263-64) (emphasis in original).

and that *Bain* "was not a stockholder—much less a controlling stockholder—of the Company prior to the Preferred Share Issuance."[72]  In other words, according to defendants, *Gentile* should not apply here because there was no expropriation of either voting power or economic value by the controlling stockholder (HIG) that was in place when the Transactions were approved.

Relying on *Gatz v. Ponsoldt*,[73] Klein responds that the court should consider the substance of the Transactions irrespective of their form.  In *Gatz*, our Supreme Court applied *Gentile* to hold that minority stockholders of Regency Affiliates, Inc. could bring direct claims against its directors, its prior controlling stockholder, and its new majority stockholder where "the direct beneficiary of any alleged expropriation of . . . voting power and economic value" arising from a recapitalization was a third party that owned no Regency stock before the recapitalization.[74]  The Supreme Court reasoned that "[l]ooking through the form of the transaction to its substance, it becomes apparent that the Recapitalization is properly analyzed as two separate transactions that [the controlling stockholder], by creative timing and coordination, caused simultaneously to be rolled into one."[75] The first transaction "was a [*Gentile*] expropriation of voting power and economic

---

[72] Dir. Defs.' Opening Br. 18

[73] 925 A.2d 1265, 1279-80 (Del. 2007).

[74] *Id.* at 1279.

[75] *Id.*

20

value from the public shareholders by and to the controlling shareholder" and the second "was a transfer of the benefits of that expropriation by the controlling shareholder to the third party."[76] Plaintiff argues that, similar to *Gatz*, the substance of the deal challenged in this case is that HIG expropriated voting power and economic value from the Company's minority stockholders that it transferred to Bain as part of a series of interrelated Transactions.

Even if the court were to ignore the form of the Transactions here and treat Bain as if it were the Company's controlling stockholder *before* it acquired the Preferred Stock, Klein's claims nevertheless would not fit within the *Gentile* framework in my view, particularly in light of the Supreme Court's recent *El Paso* decision. As previously mentioned, that decision expresses caution in applying *Gentile* so as not to "expand the universe of claims that can be asserted 'dually'" and makes clear that, to trigger *Gentile*, there must be a transfer of "both economic value *and* voting power from the minority stockholders to the controlling stockholder."[77]

Here, if one assumes for the sake of argument that the Transactions were sequenced so that Bain acquired HIG's common shares of Surgery Partners *before* it acquired the Preferred Stock, there would not have been a transfer of economic value of the nature contemplated in the *Gentile* line of cases. To be sure, this

---

[76] *Id.*

[77] *El Paso*, 152 A.3d at 1263-64.

21

hypothetical scenario would have resulted in a dilution of the minority stockholders' voting power. This is because the Preferred Stock votes with the common as a single class and the net effect of the Bain Share Issuance in the hypothetical is that Bain's voting power would have increased from approximately 54% to approximately 66% of all classes of the Company's capital stock, thereby diluting the voting power of the minority stockholders commensurately.

But, and this is the critical point, the minority stockholders would not have been diluted similarly in this scenario as an economic matter because they retained the same percentage of the Company's shares of common stock after the Preferred Stock was issued as they had before. Thus, there would not have been the type of transfer of economic value normally contemplated in a *Gentile* claim: a "dilutive stock issuance to a controlling stockholder."[78] Indeed, all else being equal, the minority stockholders' aggregate percentage of the Company's common stock would not be reduced until such time, *if ever*, that the Preferred Stock is converted into common stock—an event that is not alleged to have occurred.[79]

---

[78] *Sciabacucchi*, 2018 WL 3599997, at *10.

[79] The fact that the Preferred Stock has not been converted distinguishes this case from Vice Chancellor Noble's decision in *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *23-26 (Del. Ch. Sept. 4, 2014). There, the court applied *Gentile* to a recapitalization that resulted in the issuance of convertible preferred stock to two members of a control group. Unlike here, the preferred shares in *Nine Systems* had been converted into common shares that were cashed out in a merger before the lawsuit was filed, resulting in a dilution of the economic rights of the minority common stockholders so that they received a lower percentage of the merger consideration. *Id.* at *20. On appeal, the

22

In this case, unlike in *Gentile*, the economic harm that allegedly occurred came not from the issuance of shares of stock to a controller that resulted in an expropriation of economic value from the minority stockholders *by diluting their aggregate ownership percentage*, but from the issuance of a different type of security (the Preferred Stock) whose terms allegedly should have commanded a higher price than was paid. As noted above, the core grievance in the Complaint is that Bain "got an extraordinarily favorable dividend rate of 10%" even though "the Preferred Stock had significant option value because the conversion price was already lower than the trading price."[80] In other words, the Complaint pleads that Bain paid the Company too little for the Preferred Stock given its favorable terms. The benefit of any recovery to remedy this alleged harm logically would go to the Company rather than any specific stockholder(s) and thus the underlying legal theory is plainly derivative in nature.[81]

---

Supreme Court did not independently analyze the *Gentile* issues. In a short order of affirmance issued one year before its *El Paso* decision, the Supreme Court simply stated that, "[i]n this case, the Court of Chancery had to apply a challenging body of law in a hotly contested matter," noting that the trial court had "addressed three times whether the plaintiffs' central claim was direct or derivative under *Gentile*." *Fuchs v. Wren Hldgs., LLC*, 129 A.3d 882, 882 & n.1 (TABLE) (Del. 2015).

[80] Compl. ¶ 5; *see also id.* ¶ 47.

[81] *See Tooley*, 845 A.2d at 1033 (stating that whether a claim is direct or derivative turns on "who would receive the benefit of any recovery").

In sum, the *Gentile* framework does not fit the facts pled in this case. In keeping with our Supreme Court's recent teachings, therefore, I decline to expand that doctrine's reach to treat Counts I-IV of the Complaint as dual claims in order to avoid further erosion of the *Tooley* framework for distinguishing between direct and derivative claims.[82] Accordingly, Counts I-IV must be dismissed. The court turns next to consider whether Klein has pled facts showing that making a demand on the Board would have been futile with respect to his parallel derivative claims.

## B. Klein Has Adequately Pled Demand Futility for his Derivative Claims.

"Making a pre-suit demand is futile when the directors upon whom the demand would be made 'are incapable of making an impartial decision regarding

---

[82] Given the court's conclusion that plaintiff's claims are exclusively derivative, it is unnecessary to address defendants' argument that the requirements of Rule 23.1 should be applied to Counts I-IV even if those claims were found to be dual in nature based on recent Court of Chancery decisions that have advocated this approach. *See Chester Cty. Emps.' Ret. Fund v. New Residential Inv. Corp.*, 2016 WL 5865004, at *8 (Del. Ch. Oct. 7, 2016) ("Even assuming the claims here are dual-natured, as Plaintiff argues, I find that conducting a Rule 23.1 demand analysis for claims that a corporation overpaid for a third-party's assets with stock best harmonizes the case law."); *Calesa Assocs., L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *8-9 (Del. Ch. Feb. 29, 2016) (suggesting that the idea that a dual-natured claim should be addressed under the Rule 23.1 standard is "self-evidently reasonable and efficient" but failing to apply it as neither party argued that doing so would be appropriate); *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 132 A.3d 67, 113 (Del. Ch. 2015) ("Classifying the claim as derivative for purposes of this stage of the litigation serves the policy goal of screening for meritless claims through a combination of the demand doctrine and the heightened pleading standards of Rule 23.1. These standards weed out weak claims while permitting strong claims involving breaches of the duty of loyalty to survive."), *rev'd on other grounds*, *El Paso Pipeline*, 152 A.3d 1248.

such litigation.'"[83]  Klein did not make a demand on the Board, so he must allege with particularity that his failure to do so should be excused.[84]  "In this analysis, I accept as true [Klein's] particularized allegations of fact and draw all reasonable inferences that logically flow from those allegations in [Klein's] favor."[85]

Delaware law has two tests for determining whether demand is excused:  the test articulated in *Aronson v. Lewis*[86] and the test articulated in *Rales v. Blasband.*[87] The *Aronson* test applies when "a *decision* of the board of directors is being challenged in the derivative suit."[88]  The *Rales* test, in contrast, applies when "the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit."[89]  *Rales* identified three examples of scenarios where this could arise:

> (1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where . . . the decision being challenged was made by the board of a different corporation.[90]

---

[83] *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *12 (Del. Ch. Mar. 26, 2018) (citing *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993)).

[84] Ch. Ct. R. 23.1.

[85] *Carr*, 2018 WL 1472336, at *12 (citations omitted).

[86] 473 A.2d 805 (Del. 1984).

[87] 634 A.2d 927 (Del. 1993).

[88] *Id.* at 933.

[89] *Id.* at 933-34.

[90] *Id.* at 934 (citations omitted).

In this case, both parties agree that *Aronson* applies. This is the correct test because Klein is challenging a board action—the Board's approval of the Transactions—and four out of five of the directors on the Board at that time (Doyle, Feinstein, Turner, and DeLuca) comprised four out of seven members of the Board when this action was filed (the "Demand Board").

Under *Aronson*, "to show demand futility, [Klein] must provide particularized factual allegations that raise a reasonable doubt that (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[91] Under the first prong:

> Disinterested means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally. Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.[92]

With respect to the second prong, this court has explained that the plaintiff must "plead particularized facts sufficient to raise (1) a reason to doubt that the action was

---

[91] *In re Citigroup Inc.*, 964 A.2d at 120 (second alteration in original) (citation and internal quotation marks omitted).

[92] *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 821 (Del. Ch. 2005) (Lamb, V.C.) (internal quotation marks omitted).

taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision."[93]

The Demand Board consisted of the following seven members: Adlerz, DeLuca, Doyle, Feinstein, Gordon, O'Reilly, and Turner.[94] Thus, to establish demand futility under *Aronson*, Klein must impugn the ability of at least half (*i.e.*, four) of the Demand Board directors to have considered a demand impartially.[95]

Klein concedes that DeLuca and Feinstein were disinterested and independent.[96] Defendants do not argue that Adlerz, Gordon, and O'Reilly were independent,[97] and the Complaint's allegations raise a reasonable doubt about their independence. This is because, when the Complaint was filed, Gordon and O'Reilly were Managing Directors of Bain and Adlerz was the CEO of Surgery Partners.[98] Thus, the result here turns on the sufficiency of the allegations concerning one of the remaining two directors: Doyle and Turner. If Klein has alleged particularized facts

---

[93] *Lenois v. Lawal*, 2017 WL 5289611, at *10 (Del. Ch. Nov. 7, 2017) (quoting *In re J.P. Morgan Chase*, 906 A.2d at 824)).

[94] Compl. ¶ 29.

[95] *See Beneville v. York*, 769 A.2d 80, 82 (Del. Ch. 2000) (Strine, V.C.) (stating that the "central question is whether there is a sufficient number of impartial directors who can cause the corporation to act favorably on a demand").

[96] Pl.'s Opp'n Br. 32.

[97] Tr. 6, 29 (Sept. 13, 2018) (defense counsel acknowledging that demand futility turns on Turner and Doyle).

[98] Compl. ¶¶ 20-22.

to raise a reasonable doubt that either one was not disinterested or independent when this action was filed, then demand would be excused. In my opinion, Klein has done so with respect to Doyle.[99]

When the Complaint was filed in December 2017, Doyle, who had been the Company's CEO less than three months earlier, was in the middle of a six-month consulting services agreement with the Company that paid him $275,000 or approximately $45,833 per month.[100] This amount was more, on a monthly basis, than Doyle's base salary as Surgery Partners' CEO for 2016, which was $450,000 per year or approximately $37,500 per month.[101]

This court has found that a "consulting agreement suggests a lack of independence" for purposes of examining demand futility.[102] In *Orman v. Cullman*, Chancellor Chandler found it "reasonable to infer that $75,000 would be material" to the director in question and that he would be "beholden to the controlling shareholders for future renewals of his consulting contract."[103] Similarly here, it is reasonable to infer that a Bain-controlled Surgery Partners could have chosen to

---

[99] Given the court's findings concerning Doyle's lack of independence for demand futility purposes, it is unnecessary to consider whether the facts pled in the Complaint are sufficient to raise a reasonable doubt about Turner's disinterestedness or independence.

[100] Compl. ¶ 51.

[101] *Id.* ¶ 51 n.10.

[102] *Orman v. Cullman*, 794 A.2d 5, 30 (Del. Ch. 2002).

[103] *Id.*

renew Doyle's consulting contract, impairing his ability to act independently of Bain.[104] This is especially true because the consulting agreement at issue paid Doyle more on a monthly basis than his former salary as CEO.[105]

This inference is further supported by NASDAQ and NYSE rules providing, with certain exceptions not relevant here, that a person shall not be considered independent if that person received $120,000 or more in consulting fees during any twelve-month period within the three preceding years.[106] It is true, as defendants point out, that exchange listing rules do "not operate as a surrogate for[] this Court's

---

[104] Defendants assert it "[s]eems unlikely" that the Company would have renewed Doyle's consulting agreement since he had just been replaced as CEO of the Company. Tr. 37 (Sept. 13, 2018). Doyle's replacement as CEO, however, did not prevent the Company from entering into a consulting agreement with Doyle in the first place and the court must "draw all reasonable inferences that logically flow" from the particularized allegations of the Complaint in plaintiff's favor at the pleadings stage. *Carr*, 2018 WL 1472336, at *12.

[105] In questioning the materiality to Doyle of these consulting fees, defendants ask the court to consider certain information not found in the Complaint, *i.e.*, Doyle's total 2016 compensation and the amount of his stockholdings in the Company as reported in certain public filings of the Company. *See* Dir. Defs.' Opening Br. 28-29. The court declines to do so because the information in question is being offered for its truth and the sources of the information are not incorporated into the Complaint. *See Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 612-13 (Del. 1996) ("The exceptions to the general Rule 12(b)(6) prohibition against considering documents outside of the pleadings are usually limited to two situations. The first exception is when the document is integral to plaintiff's claim and incorporated into the complaint. The second exception is when the document is not being relied upon to prove the truth of its contents.") (internal citations omitted). Even if the court could consider this information at the pleadings stage, its probative value for assessing Doyle's financial circumstances is open to question. Neither source, for example, would shed light on the net value of his stockholdings if they were liquidated or on the liabilities side of his net worth.

[106] *See* NASDAQ Stock Market Rules § 5605(a)(2)(B); NYSE Corporate Governance Rule 303A.02(b)(ii).

analysis of independence under Delaware law for demand futility purposes."[107]  As

Chief Justice Strine explained in *Sandys v. Pincus*, however, exchange rules are

relevant for determining independence under Rule 23.1 and it would create

"cognitive dissonance" for our jurisprudence to ignore them:

> We agree with the Court of Chancery that the Delaware independence standard is context specific and does not perfectly marry with the standards of the stock exchange in all cases, but the criteria NASDAQ has articulated as bearing on independence are relevant under Delaware law and likely influenced by our law.
>
> * * * * *
>
> The bottom line under the NASDAQ rules is that a director is not independent if she has a "relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director." The NASDAQ rules' focus on whether directors can act independently of the company or its managers has important relevance to whether they are independent for purpose of Delaware law.[108]

This court similarly has noted that "[t]he fact that a director qualifies as independent

for purposes of a governing listing standard is therefore a helpful fact which, all else

equal, makes it more likely that the director is independent for purposes of Delaware

law" and that the "opposite is likewise true."[109]

---

[107] Dir. Defs.' Reply Br. 20 (quoting *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015)).

[108] 152 A.3d 124, 131-33 (Del. 2016) (quoting NASDAQ Marketplace Rule 5606(a)(2)) (internal citations omitted).

[109] *In re EZCORP Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *36 (Del. Ch. Jan. 25, 2016); *see also In re MFW S'holders Litig.*, 67 A.3d 496, 510 (Del. Ch. 2013) ("[T]he NYSE rules governing director independence were influenced by experience in

Given that the fees being paid to Doyle under his consulting services agreement with the Company exceeded (in monthly terms) his prior salary as the Company's CEO and that those fees were significantly higher than the NASDAQ independence threshold discussed above, and given that a Bain-controlled Surgery Partners could have chosen to renew the agreement, the court concludes that Klein has pled sufficient facts to raise a reasonable doubt concerning Doyle's independence from Surgery Partners and its controller Bain when the Complaint was filed. This lack of independence also extends to the claims against HIG because those claims are intertwined with the claims against Bain and the Director Defendants. As the Complaint explains, consummation of the Bain Share Issuance was conditioned on effectuation of the HIG Share Sale and vice versa. Thus, HIG was motivated to make the terms of the Bain Share Issuance appealing to Bain so that HIG could maximize the value it could realize in selling its control position in Surgery Partners to Bain.

Additionally, insofar as the claims against HIG are concerned, this court has found that "past relationships and payments have supported a reasonable inference of 'owingness' sufficient to create a reasonable doubt about the director's ability to

---

Delaware and other states and were the subject of intensive study by expert parties. They cover many of the key factors that tend to bear on independence . . . and they are a useful source for this court to consider when assessing an argument that a director lacks independence.") (Strine, C.), *aff'd sub nom., Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

31

be impartial."[110] Relatedly, NASDAQ and NYSE guidelines provide for a three-year cooling-off period before a former officer of a corporation can be considered independent of that corporation.[111] The concerns underlying these authorities have salience here, where Doyle served as the CEO of an HIG-controlled Surgery Partners until only a few months before the Complaint was filed, and where, as of the same date, Doyle was continuing to receive substantial severance and other forms of payments from his tenure as Surgery Partners' CEO.[112]

For the reasons explained above, Klein has pled sufficient particularized facts to raise a reasonable doubt concerning the independence of a majority of the directors on the Demand Board. Thus, his failure to make a demand is excused.

### C. Defendants' Motion to Dismiss under Court of Chancery Rule 12(b)(6) Must Be Granted in Part and Denied in Part.

In this section, the court considers defendants' various arguments for dismissal of Counts V-VIII under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. As noted above, two of these claims (Counts VII and VIII)

---

[110] *EZCORP*, 2016 WL 301245, at *42 (citation omitted).

[111] *See* NASDAQ Stock Market Rules § 5605(a)(2)(A); NYSE Corporate Governance Rule 303A.02(b)(i).

[112] Compl. ¶ 51. *See also EZCORP*, 2016 WL 301245, at *42 (finding that a reasonable doubt was raised as to a former CEO's independence where he continued to receive compensation pursuant to a consulting agreement and was not independent under the NASDAQ standards).

are pled in the alternative to Count VI.  Thus, the court begins by analyzing Count VI and then turns to the remaining claims.

### 1. The Complaint Fails to Plead Facts to Support a Reasonable Inference that Bain Was Part of a Control Group.

In Count VI, Klein asserts a derivative claim for breach of fiduciary duty against Bain and HIG on the theory that together they "were effectively controlling stockholders of the Company" or, in other words, that they were part of a control group.[113]  Klein devotes one paragraph of his brief attempting to explain the basis for such a claim, which he admits is "novel."[114]  Drawing from this court's observation that "Delaware corporate decisions consistently have looked to who wields control in substance and have imposed the risk of fiduciary liability on that person," Klein poses a hypothetical:  "If—and to the extent that—the HIG Share Sale was negotiated first, then, in substance, control—and all economic exposure to Surgery Partners—passed to Bain and it would be appropriate to impose concomitant fiduciary liability upon Bain."[115]

To say that Count VI is novel is an understatement.  It is not alleged that Bain owned *any* stock of Surgery Partners until the Transactions closed and thus, by

---

[113] Compl. ¶ 87.

[114] Pl.'s Opp'n Br. 51.

[115] *Id.* 51-52 (quoting *EZCORP*, 2016 WL 301245, at *9) (internal quotation marks omitted).

definition, Bain could not have been part of a "group" of Company stockholders when the Transactions were negotiated. More generally, the Complaint is devoid of any allegations that Bain was a party to any agreement or arrangement that controlled the votes of any shares of the Company's stock held by HIG,[116] or that Bain otherwise took any action to exercise control over the directors of Surgery Partners before the parties entered into the Transactions.[117] The most that reasonably can be inferred from the Complaint's allegations about Bain's status before the Transactions were entered into is that Bain had the potential to later exercise control over the Company. But the "potential to exercise control" is not enough to impose fiduciary obligations.[118] Accordingly, Count VI fails to state a claim for relief.

---

[116] *See In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, *24 (proving a "control group" requires a plaintiff to prove that a group of stockholders was "connected in some legally significant way—e.g., by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal.") (internal quotation marks and citations omitted).

[117] *See In re Morton's Restaurant Grp., Inc. S'holder Litig.*, 74 A.3d 656, 664-65 (Del. Ch. 2013) (Strine, C.) (to plead control by a minority stockholder, a plaintiff must allege facts showing "actual domination and control over . . . [the] directors" that "must be so potent that independent directors . . . cannot freely exercise their judgment" for fear of retribution) (internal quotation marks omitted).

[118] *In re Sea-Land Corp. S'holders Litig.*, 1987 WL 11283, at *5 (Del. Ch. May 22, 1987) (reasoning that the "potential ability to exercise control is not equivalent to the actual exercise of that ability," and only actual control over the board's decision-making process suffices to impose fiduciary duties) (emphasis omitted); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055-56 (Del. Ch. 1984) ("Plaintiffs' contention that Burlington occupied a fiduciary role because of its potential for control is subject to the same infirmity as its contract argument. . . . State law claims of breach of contract and breach of fiduciary relationship must subsist on the actuality of a specific legal relationship, not in its potential."), *aff'd*, 575 A.3d 1131 (Del. 1990).

## 2. The Complaint States a Claim against HIG for Breach of Fiduciary Duty as the Company's Controlling Stockholder.

In Count VII, Klein asserts, in the alternative to Count VI, a derivative claim against HIG as the Company's sole controlling stockholder for causing the Company to enter into the Bain Share Issuance. The disposition of defendants' motion to dismiss this claim under Rule 12(b)(6) turns on what standard of review applies to the claim.

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[119] At one end of the spectrum, "Delaware's default standard of review is the business judgment rule, a principle of non-review that 'reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation.'"[120] Under the business judgment rule, the court presumes that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[121] "Only when

---

[119] *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *30 (Del. Ch. Oct. 16, 2018) (quoting *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011)).

[120] *Id.* at *31 (quoting *In re Trados Inc. S'holder Litig. (Trados I)*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009)).

[121] *Aronson*, 473 A.2d at 812.

a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty."[122]

At the other end of the spectrum, "Delaware's most onerous standard" is entire fairness.[123] "Once entire fairness applies, the defendants must establish 'to the court's satisfaction that the transaction was the product of both fair dealing *and* fair price.'"[124] Importantly, "controlling stockholders are not automatically subject to entire fairness review when a controlled corporation effectuates a transaction. Rather, the controller also must engage in a conflicted transaction for entire fairness to apply."[125] As this court has discussed many times, conflicted transactions involving controlling stockholders come in many forms, such as where a controller stands on both sides of a transaction and "where the controller gets a unique benefit by extracting something uniquely valuable to the controller."[126]

---

[122] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 34 (Del. Ch. 2014).

[123] *In re Trados Inc. S'holder Litig. (Trados II)*, 73 A.3d 17, 44 (Del. Ch. 2013).

[124] *PLX Tech.*, 2018 WL 5018535, at *30 (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995)).

[125] *IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (Del. Ch. Dec. 11, 2017) (internal quotation marks and citation omitted).

[126] *Id.* (internal quotation marks and citation omitted); *see also EZCORP*, 2016 WL 301245, at *11-15 (collecting cases and stating that "the entire fairness framework governs any transaction between a controller and the controlled corporation in which the controller receives a non-ratable benefit"); *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *12-13 (Del. Ch. Oct. 24, 2014) ("The second variety of controller transactions implicating entire fairness review involves situations where the controller does not stand on both sides of the transaction, but nonetheless receives different consideration or derives some unique benefit from the transaction not shared with the common stockholders.").

The latter scenario is relevant here. Defendants contend that the Complaint fails to allege sufficient facts to support the inference that HIG received a unique or "non-ratable" benefit warranting entire fairness review and that the Transactions thus should be subject to business judgment review. I disagree.

According to the Complaint, HIG secured for itself as part of the Transactions a price of $19 per share in cash to sell all of its common stock of Surgery Partners—representing a 54% stake in the Company—when the most recent closing market price of the Company's shares was $18.20 per share.[127] The HIG Share Sale thus yielded HIG a premium for its shares of approximately 4% above the per share market price, equating to a total premium of approximately $20 million.[128] The transaction was "non-ratable." No other stockholder of the Company was afforded the opportunity to participate in the transaction. From these facts, it is reasonable to infer that the HIG Share Sale afforded HIG a unique and valuable opportunity to liquidate its control stake in one shot at an attractive price to a qualified buyer.[129] The inference that the HIG Share Sale had unique value to, and posed a conflict for,

---

[127] Compl. ¶ 1.

[128] Tr. 68 (Sept. 13, 2018).

[129] *See N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888, at *3, *10 (Del. Ch. Sept. 20, 2011) (indicating that for a controller, "selling his shares into the market was not an attractive option, as selling such a large number of shares would exert downward pressure on the share price" and finding that this alleged illiquidity permitted an inference that the controller obtained liquidity as a unique benefit in a merger).

HIG is bolstered by the fact that HIG's representative on the Board at the time (Lozow) abstained from voting on the Transactions.

Critically, the HIG Share Sale and the Bain Share Issuance were dependent on each other and neither could have occurred without HIG's blessing. More specifically, with respect to the Bain Share Issuance that is the focus of Klein's claims, HIG's approval as the Company's majority stockholder was essential to amend the Company's certificate of incorporation to issue the Preferred Stock on the terms proposed.[130] The interrelated nature of the Transactions and the need for HIG's approval thus created a dynamic in which Bain was incentivized to make the terms of its acquisition of HIG's control stake in the Company as attractive as possible to HIG to obtain its consent to the Bain Share Issuance.

In sum, the facts pled in the Complaint are sufficient in my view to subject the Bain Share Issuance to entire fairness review for purposes of this motion due to the conflict posed to HIG as the Company's controlling stockholder with respect to another aspect of the Transactions (*i.e.*, the HIG Share Sale) that was integral to and inseparable from the Bain Share Issuance. Accordingly, defendants' contention that

---

[130] *See* Compl. ¶ 40 (indicating that HIG approved the Transactions); *see also* Surgery Partners Form 8-K (May 11, 2017) (reflecting that HIG voted to amend the certificate of incorporation to issue the Preferred Stock under the Bain Share Issuance). The court takes judicial notice of the information in this Form 8-K, which is quoted in the Complaint (*see, e.g.*, Compl. ¶ 33) and integral to Klein's allegations. *See Vanderbilt Income*, 691 A.2d at 612-13.

Count VI should be dismissed on the ground that the claim is governed by the business judgment rule fails.

"The possibility that the entire fairness standard of review may apply tends to preclude the Court from granting a motion to dismiss under Rule 12(b)(6) unless the alleged controlling stockholder is able to show, conclusively, that the challenged transaction was entirely fair based solely on the allegations of the complaint and the documents integral to it."[131]  HIG has not done so.  Nor could HIG do so given numerous facts alleged in the Complaint that raise litigable issues concerning the fairness of the Bain Share Issuance as an integral part of the Transactions.

As to the process, for example, the Complaint alleges that the Transactions were negotiated without using a special committee, from which it reasonably could be inferred that HIG's Board representative (Lozow) participated in the negotiations before abstaining from voting on the Transactions; that the same law firm and accounting advisor represented both Bain and Surgery Partners in connection with the Transactions; that the Company's financial advisor did not issue a fairness opinion concerning the Preferred Stock and was conflicted because it provided financing for the NSH Acquisition; and that the Transactions were not subject to a

---

[131] *Hamilton P'rs, L.P. v. Highland Capital Mgmt., L.P.*, 2014 WL 1813340, at *12 (Del. Ch. May 7, 2014).

majority-of-the-minority stockholder vote or any form of stockholder consideration other than approval by HIG.[132]

And as to price, Klein asserts that the dividend rate for the Preferred Stock (10% compounded quarterly) was high when compared to the 8.875% rate on $400 million of senior unsecured notes Surgery Partners issued in March 2016 and to the less than 6% yield of the iShares U.S. Preferred Stock ETF.[133] Klein further asserts that the dividend rate was particularly rich when considered as part of a package of other favorable terms for the Preferred Stock, including (i) voting rights, (ii) a conversion feature that immediately was "near" or "in" the money, (iii) the right to elect two directors to the Company's Board voting as a separate class, (iv) a PIK feature, (v) veto rights over various transactions, and (vi) a liquidation preference.[134]

For the reasons explained above, Count VI of the Complaint states a claim for breach of fiduciary duty against HIG as the Company's controlling stockholder.

---

[132] Compl. ¶¶ 4, 40, 42-43, 46.

[133] The iShares U.S. Preferred Stock ETF seeks investment results that correspond generally to the price and yield performance of the S&P U.S. Preferred Stock Index. Pl.'s Opp'n Br. 45 n.149.

[134] Compl. ¶¶ 5, 34, 47; Tr. 18 (Sept. 13, 2018) (explaining PIK feature of dividend).

### 3. The Complaint States a Claim against Bain for Aiding and Abetting a Breach of Fiduciary Duty.

In Count VIII, Klein asserts, in the alternative to Count VI, a derivative claim against Bain for aiding and abetting HIG's breach of fiduciary duty.[135] To state such a claim:

> the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach.[136]

The first two and the fourth elements are satisfied for the reasons discussed in the previous section, *i.e.*, the well-pled allegations of the Complaint state a claim for breach of fiduciary duty against HIG as the Company's controlling stockholder that, if proven, could support a claim for damages if the consideration the Company received for the Preferred Stock was not fair. The only element in contention is whether it is reasonably conceivable from the allegations in the Complaint that Bain "knowingly participated in that breach."[137]

---

[135] Count VIII also asserts in conclusory fashion that Bain was unjustly enriched. Compl. ¶ 98. Klein waived this theory of relief by failing to respond in his opposition brief to Bain's argument in favor of dismissal of that aspect of Count VIII. *See Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2007 WL 2982247, at *11 (Del. Ch. Oct. 9, 2007) ("The plaintiffs have waived these claims by failing to brief them in their opposition to the motion to dismiss.").

[136] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (internal quotation marks omitted).

[137] *Id.* at 1097.

There is no single template for pleading the "knowing participation" element of an aiding and abetting claim. To the contrary, this element can be inferred from a variety of circumstances:

> For example, knowing participation may be inferred where the terms of the transaction are so egregious or the magnitude of the side deals is so excessive as to be inherently wrongful. In addition, the Court may infer knowing participation if it appears that the defendant may have used knowledge of the breach to gain a bargaining advantage in the negotiations. The plaintiff's burden of pleading knowing participation may also be met through direct factual allegations supporting a theory that the defendant sought to induce the breach of fiduciary duty, such as through the offer of side payments intended as incentives for the fiduciaries to ignore their duties. And . . . a bidder may be liable to the target's stockholders if the bidder attempts to exploit conflicts of interest in the board or conspires with the board to breach a fiduciary duty.[138]

Here, the core fact pled in the Complaint that undercuts the suggestion that the Bain Share Issuance was the product of arm's-length bargaining is that it was conditioned on the approval of the HIG Share Sale. This requirement placed HIG in a conflicted position where its interest in obtaining the highest price possible for its majority stake in Surgery Partners was directly in tension with its fiduciary obligation to ensure that the Company—from which HIG was about to exit— received fair consideration for the Preferred Stock. As a necessary signatory to the contracts to implement the Transactions, which were cross-conditioned on each

_____

[138] *Morgan v. Cash*, 2010 WL 2803746, at \*4 (Del. Ch. July 16, 2010) (Strine, V.C.) (internal quotation marks and citations omitted).

42

other, Bain was in a prime position to exploit HIG's conflict of interest to obtain an unfair bargaining advantage in the setting of the terms of the Preferred Stock.

A number of facts pled in the Complaint calling into question the fairness of the process, moreover, support a reasonable inference that Bain may have knowingly exploited HIG's conflict to its advantage. To repeat, these include the alleged facts that (i) Bain used the same counsel and accounting advisor as the Company during the negotiations, (ii) the Board did not utilize a special committee to exclude HIG's representative on the Board (Lozow) from participating in the negotiations concerning the Bain Share Issuance despite the conflict that transaction presented to HIG with respect to selling its control position to Bain, (iii) no stockholder other than HIG would have any say in approving any of the Transactions, and (iv) the Company's financial advisor would not provide a fairness opinion concerning the consideration paid for the Preferred Stock.[139]

Based on the foregoing, the court finds that the Complaint's allegations are sufficient to plead a reasonably conceivable claim that Bain knowingly participated in a breach of fiduciary duty. Thus, Count VIII states a claim against Bain for aiding and abetting a breach of fiduciary duty by HIG.

---

[139] Compl. ¶¶ 4, 40, 42-43, 46.

### 4. The Complaint Fails to State a Claim for Breach of Fiduciary Duty Against Doyle.

As initially pled, Count V of the Complaint asserted that the five Director Defendants breached their fiduciary duties by approving the Transactions without ensuring that the Bain Share Issuance was entirely fair. Four of the five directors (DeLuca, Feinstein, Lozow, and Turner) have since been dismissed from this action,[140] leaving Doyle as the only remaining Director Defendant.

Surgery Partners' certificate of incorporation contains a provision exculpating its directors for breaches of the duty of care, as is permitted under 8 *Del. C.* § 102(b)(7).[141] Thus, to plead a non-exculpated claim for breach of fiduciary duty against Doyle, the Complaint must plead "facts supporting a rational inference that [he] harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom [he] could not be presumed to act independently, or acted in bad faith."[142]

The Complaint does not assert that Doyle acted in bad faith or that he was personally interested in the Transactions. Rather, the Complaint asserts that Doyle

---

[140] Dkt. 32, 46.

[141] Dkt. 44, Ex. A, Art. VI (exculpating the Company's directors "[t]o the fullest extent that the [Delaware General Corporation Law] or any other law of the State of Delaware . . . permits").

[142] *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1179-80 (Del. 2015).

acted to advance the self-interest of HIG when he approved the Transactions. The contention is theoretically plausible given that Doyle was the CEO of Surgery Partners when the Transactions were negotiated and he may have been motivated to curry favor with HIG or Bain to maintain his position as CEO, but there simply are no facts alleged in the Complaint specific to Doyle that indicate that he advanced HIG's self-interest as plaintiff theorizes. Accordingly, Count V will be dismissed as to Doyle, but with prejudice to the named plaintiff only in the same manner that Lozow and Turner were dismissed.

## IV. CONCLUSION

For the reasons explained above, defendants' motion to dismiss is GRANTED in part and DENIED in part. Counts I-IV, VI, and the unjust enrichment aspect of Count VIII are dismissed with prejudice, and Count V is dismissed in the manner set forth above. Count VII and the aiding and abetting aspect of Count VIII both survive. Counsel are directed to confer and to submit an implementing order within ten business days.

**IT IS SO ORDERED.**